# DEWSNUP *v.* TIMM ET AL.

No. 90–741.   Argued October 15, 1991—Decided January 15, 1992

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, O'CONNOR, and KENNEDY, JJ., joined. SCALIA, J., filed a dissenting opinion, in which SOUTER, J., joined, *post*, p. 420. THOMAS, J., took no part in the consideration or decision of the case.

*Timothy B. Dyk* argued the cause for petitioner. With him on the briefs was *Patricia A. Dunn.*

*Richard G. Taranto* argued the cause for respondents. With him on the brief were *H. Bartow Farr III* and *Michael Z. Hayes.*

*Ronald J. Mann* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Roberts*, and *Alan Charles Raul.**

JUSTICE BLACKMUN delivered the opinion of the Court.

We are confronted in this case with an issue concerning § 506(d) of the Bankruptcy Code, 11 U. S. C. § 506(d).[1]  May

---

*\*Michael Fox Mivasair* and *Henry J. Sommer* filed a brief for the Consumers Education and Protective Association, Inc., as *amicus curiae* urging reversal.

[1] Section 506 provides in full:

"(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount

a debtor "strip down" a creditor's lien on real property to the value of the collateral, as judicially determined, when that value is less than the amount of the claim secured by the lien?

I

On June 1, 1978, respondents loaned $119,000 to petitioner Aletha Dewsnup and her husband, T. LaMar Dewsnup, since deceased. The loan was accompanied by a Deed of Trust granting a lien on two parcels of Utah farmland owned by the Dewsnups.

Petitioner defaulted the following year. Under the terms of the Deed of Trust, respondents at that point could have proceeded against the real property collateral by accelerating the maturity of the loan, issuing a notice of default, and selling the land at a public foreclosure sale to satisfy the debt. See also Utah Code Ann. §§ 57–1–20 to 57–1–37 (1990 and Supp. 1991).

---

so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

"(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

"(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

"(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—

"(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

"(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title."

Respondents did issue a notice of default in 1981. Before the foreclosure sale took place, however, petitioner sought reorganization under Chapter 11 of the Bankruptcy Code, 11 U. S. C. § 1101 *et seq.* That bankruptcy petition was dismissed, as was a subsequent Chapter 11 petition. In June 1984, petitioner filed a petition seeking liquidation under Chapter 7 of the Code, 11 U. S. C. § 701 *et seq.* Because of the pendency of these bankruptcy proceedings, respondents were not able to proceed to the foreclosure sale. See 11 U. S. C. § 362 (1988 ed. and Supp. II).

In 1987, petitioner filed the present adversary proceeding in the Bankruptcy Court for the District of Utah seeking, pursuant to § 506, to "avoid" a portion of respondents' lien. App. 3. Petitioner represented that the debt of approximately $120,000 then owed to respondents exceeded the fair market value of the land and that, therefore, the Bankruptcy Court should reduce the lien to that value. According to petitioner, this was compelled by the interrelationship of the security-reducing provision of § 506(a) and the lien-voiding provision of § 506(d). Under § 506(a) ("An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property"), respondents would have an "allowed secured claim" only to the extent of the judicially determined value of their collateral. And under § 506(d) ("To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void"), the court would be required to void the lien as to the remaining portion of respondents' claim, because the remaining portion was not an "allowed secured claim" within the meaning of § 506(a).

The Bankruptcy Court refused to grant this relief. *In re Dewsnup*, 87 B. R. 676 (1988). After a trial, it determined that the then value of the land subject to the Deed of Trust was $39,000. It indulged in the assumption that the property had been abandoned by the trustee pursuant to § 554,

and reasoned that once property was abandoned it no longer fell within the reach of § 506(a), which applies only to "property in which the estate has an interest," and therefore was not covered by § 506(d).

The United States District Court, without a supporting opinion, summarily affirmed the Bankruptcy Court's judgment of dismissal with prejudice. App. to Pet. for Cert. 12a.

The Court of Appeals for the Tenth Circuit, in its turn, also affirmed. *In re Dewsnup*, 908 F. 2d 588 (1990). Starting from the "fundamental premise" of § 506(a) that a claim is subject to reduction in security only when the estate has an interest in the property, the court reasoned that because the estate had no interest in abandoned property, § 506(a) did not apply (nor, by implication, did § 506(d)). *Id.*, at 590–591. The court then noted that a contrary result would be inconsistent with § 722 under which a debtor has a limited right to redeem certain personal property. *Id.*, at 592.

Because the result reached by the Court of Appeals was at odds with that reached by the Third Circuit in *Gaglia* v. *First Federal Savings & Loan Assn.*, 889 F. 2d 1304, 1306–1311 (1989), and was expressly recognized by the Tenth Circuit as being in conflict, see 908 F. 2d, at 591, we granted certiorari. 498 U. S. 1081 (1991).

## II

As we read their several submissions, the parties and their *amici* are not in agreement in their respective approaches to the problem of statutory interpretation that confronts us. Petitioner-debtor takes the position that §§ 506(a) and 506(d) are complementary and to be read together. Because, under § 506(a), a claim is secured only to the extent of the judicially determined value of the real property on which the lien is fixed, a debtor can void a lien on the property pursuant to § 506(d) to the extent the claim is no longer secured and thus is not "an allowed secured claim." In other words, § 506(a) bifurcates classes of claims allowed under § 502 into secured

claims and unsecured claims; any portion of an allowed claim deemed to be unsecured under § 506(a) is not an "allowed secured claim" within the lien-voiding scope of § 506(d). Petitioner argues that there is no exception for unsecured property abandoned by the trustee.

Petitioner's *amicus* argues that the plain language of § 506(d) dictates that the proper portion of an undersecured lien on property in a Chapter 7 case is void whether or not the property is abandoned by the trustee. It further argues that the rationale of the Court of Appeals would lead to evisceration of the debtor's right of redemption and the elimination of an undersecured creditor's ability to participate in the distribution of the estate's assets.

Respondents primarily assert that § 506(d) is not, as petitioner would have it, "rigidly tied" to § 506(a), Brief for Respondents 7. They argue that § 506(a) performs the function of classifying claims by true secured status at the time of distribution of the estate to ensure fairness to unsecured claimants. In contrast, the lien-voiding § 506(d) is directed to the time at which foreclosure is to take place, and, where the trustee has abandoned the property, no bankruptcy distributional purpose is served by voiding the lien.

In the alternative, respondents, joined by the United States as *amicus curiae,* argue more broadly that the words "allowed secured claim" in § 506(d) need not be read as an indivisible term of art defined by reference to § 506(a), which by its terms is not a definitional provision. Rather, the words should be read term-by-term to refer to any claim that is, first, allowed, and, second, secured. Because there is no question that the claim at issue here has been "allowed" pursuant to § 502 of the Code and is secured by a lien with recourse to the underlying collateral, it does not come within the scope of § 506(d), which voids only liens corresponding to claims that have *not* been allowed and secured. This reading of § 506(d), according to respondents and the United States, gives the provision the simple and sensible function

of voiding a lien whenever a claim secured by the lien itself has not been allowed. It ensures that the Code's determination not to allow the underlying claim against the debtor personally is given full effect by preventing its assertion against the debtor's property.[2]

Respondents point out that pre-Code bankruptcy law preserved liens like respondents' and that there is nothing in the Code's legislative history that reflects any intent to alter that law. Moreover, according to respondents, the "fresh start" policy cannot justify an impairment of respondents' property rights, for the fresh start does not extend to an *in rem* claim against property but is limited to a discharge of personal liability.

### III

The foregoing recital of the contrasting positions of the respective parties and their *amici* demonstrates that § 506 of the Bankruptcy Code and its relationship to other provisions of that Code do embrace some ambiguities. See 3 Collier on Bankruptcy, ch. 506 and, in particular, ¶ 506.07 (15th ed. 1991). Hypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the

---

[2] Respondents expressly stated in their brief and twice again at oral argument that they adopted as an alternative position the United States' interpretation of § 506(d). Brief for Respondents 40, n. 33; Tr. of Oral Arg. 14, 20. In dissent, however, JUSTICE SCALIA contends that respondents have not taken the same position as the United States on this issue. According to the dissent, the United States has taken the position that "a lien only 'secures' the claim in question up to the value of the security that is the object of the lien—and only up to *that* value is the lien subject to avoidance under § 506(d)." *Post*, at 424. In fact, the United States says: "Under [petitioner's] reading, Section 506(d) would operate to reduce the creditor's lien to the value of the allowed secured claim described in Section 506(a). In our view, this reading makes no sense." Brief for United States as *Amicus Curiae* 5.

case before us and allow other facts to await their legal resolution on another day.

We conclude that respondents' alternative position, espoused also by the United States, although not without its difficulty, generally is the better of the several approaches. Therefore, we hold that § 506(d) does not allow petitioner to "strip down" respondents' lien, because respondents' claim is secured by a lien and has been fully allowed pursuant to § 502. Were we writing on a clean slate, we might be inclined to agree with petitioner that the words "allowed secured claim" must take the same meaning in § 506(d) as in § 506(a).[3] But, given the ambiguity in the text, we are not convinced that Congress intended to depart from the pre-Code rule that liens pass through bankruptcy unaffected.

1. The practical effect of petitioner's argument is to freeze the creditor's secured interest at the judicially determined valuation. By this approach, the creditor would lose the benefit of any increase in the value of the property by the time of the foreclosure sale. The increase would accrue to the benefit of the debtor, a result some of the parties describe as a "windfall."

We think, however, that the creditor's lien stays with the real property until the foreclosure. That is what was bargained for by the mortgagor and the mortgagee. The voidness language sensibly applies only to the security aspect of the lien and then only to the real deficiency in the security. Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain.

Such surely would be the result had the lienholder stayed aloof from the bankruptcy proceeding (subject, of course, to

---

[3] Accordingly, we express no opinion as to whether the words "allowed secured claim" have different meaning in other provisions of the Bankruptcy Code.

the power of other persons or entities to pull him into the proceeding pursuant to § 501), and we see no reason why his acquiescence in that proceeding should cause him to experience a forfeiture of the kind the debtor proposes. It is true that his participation in the bankruptcy results in his having the benefit of an allowed unsecured claim as well as his allowed secured claim, but that does not strike us as proper recompense for what petitioner proposes by way of the elimination of the remainder of the lien.

2. This result appears to have been clearly established before the passage of the 1978 Act. Under the Bankruptcy Act of 1898, a lien on real property passed through bankruptcy unaffected. This Court recently acknowledged that this was so. See *Farrey* v. *Sanderfoot,* 500 U. S. 291, 297 (1991) ("Ordinarily, liens and other secured interests survive bankruptcy"); *Johnson* v. *Home State Bank,* 501 U. S. 78, 84 (1991) ("Rather, a bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor *in personam*—while leaving intact another—namely, an action against the debtor *in rem*").[4]

3. Apart from reorganization proceedings, see 11 U. S. C. §§ 616(1) and (10) (1976 ed.), no provision of the pre-Code

---

[4] Section 67d of the 1898 Act, 30 Stat. 564, made this explicit:

"Liens given or accepted in good faith and not in contemplation of or in fraud upon this Act, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall not be affected by this Act."

The Court, with respect to this statute, has said: "Section 67d . . . declares that liens given or accepted in good faith and not in contemplation of or in fraud upon this act, shall not be affected by it." *City of Richmond* v. *Bird,* 249 U. S. 174, 177 (1919).

This precise statutory language did not appear in a reorganization of the section in the Chandler Act of 1938, 52 Stat. 840. A respected bankruptcy authority convincingly explained that this was done not to remove the rule of validity but because "the draftsmen of the 1938 Act desired generally to specify only what should be *invalid.*" 4B Collier on Bankruptcy ¶ 70.70, p. 771 (14th ed. 1978) (emphasis in original). The alteration had no substantive effect. *Oppenheimer* v. *Oldham,* 178 F. 2d 386, 389 (CA5 1949).

statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt. Our cases reveal the Court's concern about this. In *Long* v. *Bullard*, 117 U. S. 617, 620–621 (1886), the Court held that a discharge in bankruptcy does not release real estate of the debtor from the lien of a mortgage created by him before the bankruptcy. And in *Louisville Joint Stock Land Bank* v. *Radford*, 295 U. S. 555 (1935), the Court considered additions to the Bankruptcy Act effected by the Frazier-Lemke Act, 48 Stat. 1289. There the Court noted that the latter Act's "avowed object is to take from the mortgagee rights in the specific property held as security; and to that end 'to scale down the indebtedness' to the present value of the property." 295 U. S., at 594. The Court invalidated that statute under the Takings Clause. It further observed: "No instance has been found, except under the Frazier-Lemke Act, of either a statute or decision compelling the mortgagee to relinquish the property to the mortgagor free of the lien unless the debt was paid in full." *Id.*, at 579.

Congress must have enacted the Code with a full understanding of this practice. See H. R. Rep. No. 95–595, p. 357 (1977) ("Subsection (d) permits liens to pass through the bankruptcy case unaffected").

4. When Congress amends the bankruptcy laws, it does not write "on a clean slate." See *Emil* v. *Hanley*, 318 U. S. 515, 521 (1943). Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history. See *United Savings Assn. of Texas* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 380 (1988). See also *Pennsylvania Dept. of Public Welfare* v. *Davenport*, 495 U. S. 552, 563 (1990); *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 244–245 (1989). Of course, where the language is unambiguous, silence in the legislative history can-

not be controlling. But, given the ambiguity here, to attribute to Congress the intention to grant a debtor the broad new remedy against allowed claims to the extent that they become "unsecured" for purposes of § 506(a) without the new remedy's being mentioned somewhere in the Code itself or in the annals of Congress is not plausible, in our view, and is contrary to basic bankruptcy principles.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE SCALIA, with whom JUSTICE SOUTER joins, dissenting.

With exceptions not pertinent here, § 506(d) of the Bankruptcy Code provides: "To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void . . . ." Read naturally and in accordance with other provisions of the statute, this automatically voids a lien to the extent the claim it secures is not both an "allowed claim" and a "secured claim" under the Code. In holding otherwise, the Court replaces what Congress said with what it thinks Congress ought to have said—and in the process disregards, and hence impairs for future use, well-established principles of statutory construction. I respectfully dissent.

I

This case turns solely on the meaning of a single phrase found throughout the Bankruptcy Code: "allowed secured claim." Section 506(d) unambiguously provides that to the extent a lien does not secure such a claim it is (with certain exceptions) rendered void. See 11 U. S. C. § 506(d). Congress did not leave the meaning of "allowed secured claim" to speculation. Section 506(a) says that an "allowed claim"

(the meaning of which is obvious) is also a "secured claim" "to the extent of *the value of [the] creditor's interest in the estate's interest in [the securing] property."* (Emphasis added.) (This means, generally speaking, that an allowed claim "is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured." *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 239 (1989).) When § 506(d) refers to an "allowed secured claim," it can only be referring to that allowed "secured claim" so carefully described two brief subsections earlier.

The phrase obviously bears the meaning set forth in § 506(a) when it is used in the subsections of § 506 other than § 506(d)—for example, in § 506(b), which addresses "allowed secured claim[s]" that are oversecured. Indeed, as respondents apparently concede, see Brief for Respondents 40; Tr. of Oral Arg. 29–30, even when the phrase appears outside of § 506, it invariably means what § 506(a) describes: the portion of a creditor's allowed claim that is secured after the calculations required by that provision have been performed. See, *e. g.,* 11 U. S. C. § 722 (permitting a Chapter 7 debtor to redeem certain tangible personal property from certain liens "by paying the holder of such lien the amount of the *allowed secured claim* of such holder that is secured by such lien"); § 1225(a)(5) (prescribing treatment of *"allowed secured claim[s]"* in family farmer's reorganization plan); § 1325(a)(5) (same with respect to *"allowed secured claim[s]"* in individual reorganizations). (Emphases added.) The statute is similarly consistent in its use of the companion phrase *"allowed unsecured claim"* to describe (with respect to a claim supported by a lien) that portion of the claim that is treated as "unsecured" under § 506(a). See, *e. g.,* 11 U. S. C. § 507(a)(7) (fixing priority of *"allowed unsecured claims* of governmental units"); § 726(a)(2) (providing for payment of *"allowed unsecured claim[s]"* in Chapter 7 liquidation); § 1225(a)(4) (setting standard for treatment

of *"allowed unsecured claim[s]"* in Chapter 12 plan); § 1325(a)(4) (setting standard for treatment of *"allowed unsecured claim[s]"* in Chapter 13 plan). (Emphases added.) When, on the other hand, the Bankruptcy Code means to refer to a secured party's entire allowed claim, *i. e.,* to both the "secured" and "unsecured" portions under § 506(a), it uses the term *"allowed claim"*—as in 11 U. S. C. § 363(k), which refers to "a lien that secures an allowed claim." Given this clear and unmistakable pattern of usage, it seems to me impossible to hold, as the Court does, that "the words 'allowed secured claim' in § 506(d) need not be read as an indivisible term of art defined by reference to § 506(a)." *Ante,* at 415; see *ante,* at 416–417. We have often invoked the "'normal rule of statutory construction that "'identical words used in different parts of the same act are intended to have the same meaning.'"'" *Sullivan* v. *Stroop,* 496 U. S. 478, 484 (1990) (quoting *Sorenson* v. *Secretary of Treasury,* 475 U. S. 851, 860 (1986) (quoting *Helvering* v. *Stockholms Enskilda Bank,* 293 U. S. 84, 87 (1934) (quoting *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 433 (1932)))). That rule must surely apply, *a fortiori,* to use of identical words *in the same section of the same enactment.*

The Court makes no attempt to establish a textual or structural basis for overriding the plain meaning of § 506(d), but rests its decision upon policy intuitions of a legislative character,[1] and upon the principle that a text which is "am-

---

[1] For example: "That is what was bargained for by the mortgagor and the mortgagee. . . . Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor . . . . [W]e see no reason why [the lienholder's] acquiescence in [the bankruptcy] proceeding should cause him to experience a forfeiture of the kind the debtor proposes. . . . [T]he benefit of an allowed unsecured claim . . . does not strike us as proper recompense for what petitioner proposes by way of the elimination of the remainder of the lien." *Ante,* at 417–418.

Apart from the fact that these policy judgments are inappropriate, it is not at all clear that evisceration of § 506(d) is even necessary to effectuate them. The feared "windfall" to the debtor may be prevented by 11

biguous" (a status apparently achieved by being the subject of disagreement between self-interested litigants) cannot change pre-Code law without the *imprimatur* of "legislative history." Thus abandoning the normal and sensible principle that a term (and especially an artfully defined term such as "allowed secured claim") bears the same meaning throughout the statute, the Court adopts instead what might be called the one-subsection-at-a-time approach to statutory exegesis. "[W]e express no opinion," the Court amazingly says, "as to whether the words 'allowed secured claim' have different meaning in other provisions of the Bankruptcy Code." *Ante,* at 417, n. 3. "We . . . focus upon the case before us and allow other facts to await their legal resolution on another day." *Ante,* at 416–417.

## II

As to the meaning of this single subsection (considered, of course, in a vacuum), the Court claims to be embracing "respondents' alternative position," *ante,* at 417, which is that "the words 'allowed secured claim' in § 506(d) need not be read as an indivisible term of art defined by reference to § 506(a)," *ante,* at 415; and that "secured claim" (for purposes

U. S. C. § 551, which preserves liens avoided under § 506(d) and other provisions of the Code "for the benefit of the estate," *i. e.,* for the benefit of the general unsecured creditors. See Note, An Individual Debtor's Right to Avoid Liens Under Section 506(d) of the Bankruptcy Code, 12 Cardozo L. Rev. 263, 280–281 (1990). See also *In re Ward,* 42 B. R. 946, 952–953 (Bkrtcy. Ct. MD Tenn. 1984). And the creditor whose lien has been stripped may even prevail over the other unsecured creditors by reason of 11 U. S. C. § 363(k), which permits such an undersecured creditor to apply the entire amount of his allowed claim (secured and unsecured) against the purchase price of the collateral at the trustee's foreclosure sale. This appears to enable the lien-stripped creditor (at least in the context of a trustee-managed foreclosure sale) to use his "unsecured claim" to capture any postevaluation appreciation in the collateral. See Carlson, Undersecured Claims Under Bankruptcy Code Sections 506(a) and 1111(b): Second Looks at Judicial Valuations of Collateral, 6 Bankr. Dev. J. 253, 272–279 (1989). I would leave these questions for resolution on remand.

of § 506(d) alone) simply connotes an allowed claim that is "secured" in the ordinary sense, *i. e.*, that is backed up by a security interest in property, whether or not the value of the property suffices to cover the claim. The Court attributes this position to the United States as well, *ante*, at 415–416, and n. 2, but the Government's position is in fact different— and significantly so, since it *does* (as proper statutory interpretation ought to do) give the phrase "allowed secured claim" a uniform meaning. I must describe the Government's theory and explain why it does not work.

The distinctive feature of the United States' approach is that it seeks to avoid invalidation of the so-called "underwater" portion of the lien by focusing *not* upon the phrase "allowed secured claim" in § 506(d), but upon the prior phrase "secures a claim." ("To the extent that a lien *secures a claim* against the debtor that is not an allowed secured claim, such lien is void." (Emphasis added.)) Under the Government's textual theory, this phrase can be read to refer not merely to the *object* of the security, but to its *adequacy*. That is to say, a lien only "secures" the claim in question up to the value of the security that is the object of the lien— and only up to *that* value is the lien subject to avoidance under § 506(d).[2] This interpretation succeeds in giving the

---

[2] The Court's insistence that the positions put forward by respondents and the United States are one and the same, see *ante*, at 417, n. 3, is simply mistaken. The following excerpts from the Government's brief, among others, are compatible only with the theory (which is not respondents') that the phrase "lien secures a claim" in § 506(d) means "lien is adequate security for a claim":

"On its face, [§ 506(d)] appears to take one set of circumstances—where 'a lien secures a claim'—and carve out of it a lesser and included set of circumstances—where that secured claim 'is not an *allowed* secured claim.' Liens in the carved-out set are void. . . .

"According to petitioner, what the provision means is that a lien securing an unsecured claim is void. But the provision is triggered only '[t]o the extent that a lien secures a claim,' and if a lien secures a claim the claim

phrase "allowed secured claim," which appears later in § 506(d), a meaning compatible with that compelled by § 506(a). But that is its only virtue.

To begin with, the interpretation renders some of the language in § 506(d) surplusage. If the phrase "[t]o the extent that a lien *secures* a claim" describes only that portion of a claim that is secured by actual economic value, then the later phrase "is not an allowed *secured* claim" should instead have read simply "is not allowed." For the phrase "allowed secured claim" *itself* describes a claim that is *actually* secured in light of § 506(a)'s calculations. Another reading of § 506(d)'s opening passage is available, one that does not assume such clumsy draftsmanship—and that employs, to boot, a much more natural reading of the phrase "lien secures a claim." The latter ordinarily describes the relationship between a lien and a claim, not the relationship between the value of the property subject to the lien and the amount of the claim. One would say that a "mortgage secures the claim" for the purchase price of a house, even if the value of the house was inadequate to satisfy the full amount of the claim. In other words, "[t]o the extent that a lien *secures* a claim" means in § 506(d) what it ordinarily means: "to the extent a lien provides its holder with a right to retain property in full or partial satisfaction of a claim." It means that

---

is not, at least in common parlance, unsecured. . . . [I]t is inconsistent to say—as petitioner urges—that the prime situation at which the provision is directed is one where, because the collateral is worth less than the amount of the claim, the lien in fact *fails* to secure the claim. Under petitioner's reading, a provision that applies '[t]o the extent that a lien secures a claim' actually applies *only* to the extent that the lien does *not* secure the claim." Brief for United States as *Amicus Curiae* 9 (emphasis in original) (footnote omitted).

It is of little consequence, however, whether the Government espoused this position or not. In either event, it is a *possible* interpretation (more plausible, I think, than the one the Court adopts) that merits consideration by those concerned with text.

in § 506(d) just as it means that in § 506(a), see 11 U. S. C. § 506(a) ("An allowed claim of a creditor *secured* by a lien . . . is a secured claim to the extent . . .") (emphasis added), and just as it means that elsewhere in the Bankruptcy Code, see, *e. g.,* § 362(a)(5) ("to the extent that such lien *secures* a claim"); § 363(k) ("lien that *secures* an allowed claim"). An unnatural meaning should be disfavored at any time, but particularly when it produces a redundancy. See *Montclair* v. *Ramsdell,* 107 U. S. 147, 152 (1883).

Of course *respondents'* interpretation also creates a redundancy in § 506(d). If a "secured claim" means only a claim for which a lien has been given as security (whether or not the security is adequate), then the prologue of § 506(d) can be reformulated as follows: "To the extent that a lien secures a claim against the debtor that is not an allowed claim secured by a lien, such lien is void . . . ." Quite obviously, the phrase "secured by a lien" in that reformulation is utterly redundant and absurd—as is (on respondents' interpretation) the word "secured," which bears the same meaning. In other words, both the United States' interpretation and respondents' interpretation create a redundancy: the former by making both parts of the § 506(d) prologue refer to *adequate* security, and the latter by making both parts refer to *security plain-and-simple.* Only when one gives the words in the first part of the prologue ("[t]o the extent that a lien secures a claim") their natural meaning (as the Government does not) *and* gives the words in the second part of the prologue ("allowed secured claim") their previously established statutory meaning (as the respondents do not) does the provision make a *point* instead of a *redundancy.*

Moreover, the practical consequences of the United States' interpretation would be absurd. A secured creditor holding a lien on property that is completely worthless would not face lien avoidance under § 506(d), *even if the claim secured by that lien were disallowed entirely.* The same would be true of a lien on property that has *some* value but is obvi-

ously inadequate to cover all of the disallowed claim: the lien would be voided only to the extent of the property's value at the time of the bankruptcy court's evaluation, and could be asserted against any increase in the value of the property that might later occur, in order to satisfy the disallowed claim. Unavoided liens (or more accurately, potentials of unavoided liens, since no one knows whether or when future evaluations of the relevant property will exceed that of the bankruptcy court) would impede the trustee's management and settlement of the estate. It would be difficult, for example, to sell overencumbered property subject to outstanding liens pursuant to 11 U. S. C. § 363(b) or (c), since any postsale appreciation in the property could be levied upon by holders of disallowed secured claims. And in a sale of debtor property "free and clear" of the liens attached to it, see 11 U. S. C. § 363(f)(3), the undisturbed portion of the disallowed claimant's lien might attach to the proceeds of that sale to the extent of the collateral's postpetition appreciation, preventing the trustee from distributing some or all of the sale proceeds to creditors holding allowed claims. If possible, we should avoid construing the statute in a way that produces such absurd results.

## III

Although the Court makes no effort to explain why petitioner's straightforward reading of § 506(d) is textually or structurally incompatible with other portions of the statute, respondents and the United States do so. They point out, to begin with, that the two exceptions to § 506(d)'s nullifying effect both pertain to *the disallowance of claims*, and not to *the inadequacy of security*, see 11 U. S. C. §§ 506(d)(1) and (2)—from which they conclude that the applicability of § 506(d) turns only on the allowability of the underlying claim, and not on the extent to which the claim is a "secured claim" within the meaning of § 506(a). But the fact that the statute makes no exceptions to invalidation by reason of inadequate security in no way establishes that such (plainly

expressed) invalidation does not exist. The premise of the argument—that if a statute qualifies a noun with two adjectives ("allowed" and "secured"), and provides exceptions with respect to only one of the adjectives, then the other can be disregarded—is simply false. The most that can be said is that the two exceptions in § 506(d) do not *contradict* the United States' and respondents' interpretation; but they in no way suggest or support it.

Respondents and the United States also identify supposed inconsistencies between petitioner's construction of § 506(d) and other sections of the Bankruptcy Code; they are largely illusory. The principal source of concern is § 722, which enables a Chapter 7 debtor to "redeem" narrow classes of exempt or abandoned personal property from "a lien securing a dischargeable consumer debt." The price of redemption is fixed as "the amount of the *allowed secured claim* of [the lienholder] that is secured by such lien." (Emphasis added.) This provision, we are told, would be largely superfluous if § 506(d) automatically stripped liens securing undersecured claims to the value of the collateral, *i. e.*, to the value of the allowed secured claims.

This argument is greatly overstated. Section 722 is necessary, and not superfluous, because § 506(d) is not a *redemption* provision. It reduces the value of a lienholder's equitable interest in a debtor's property to the property's liquidation value, but it does not insure the debtor an opportunity to "redeem" the property at that price, *i. e.*, to "free [the] property . . . from [the] mortgage or pledge by paying the debt for which it stood as security." Black's Law Dictionary 1278 (6th ed. 1990). Congress had good reason to be solicitous of the debtor's right to redeem personal property (the exclusive subject of § 722), since state redemption laws are typically less generous for personalty than for real property. Compare, *e. g.*, Utah Code Ann. § 57–1–31 (1990) with Uniform Commercial Code § 9–506, 3A U. L. A. 370 (1981). The most that can be said regarding § 722 is that petitioner's

construction of § 506(d) would permit a more concise formulation: Instead of describing the redemption price as "the amount of the allowed secured claim . . . that is secured by such lien" it would have been *possible* to say simply "the amount of the claim . . . that is secured by such lien"—since § 506(d) would automatically have cut back the lien to the amount of the allowed secured claim. I would hardly call the more expansive formulation a redundancy—not when it is so far removed from the section that did the "cutting back" that the reader has likely forgotten it.

Respondents and their *amicus* also make much of the need to avoid giving Chapter 7 debtors a better deal than they can receive under the other chapters of the Bankruptcy Code. They assert that, by enabling a Chapter 7 debtor to strip down a secured creditor's liens and pocket any postpetition appreciation in the property, petitioner's construction of § 506(d) will discourage debtors from using the preferred mechanisms of reorganization under Chapters 11, 12, and 13. This evaluation of the "finely reticulated" incentives affecting a debtor's behavior rests upon critical—and perhaps erroneous—assumptions about the meaning of provisions in the reorganization chapters. Respondents assume, for example, that a debtor in Chapter 13 cannot strip down a mortgage placed on the debtor's home; but that assumption may beg the very question the Court answers today. True, § 1322(b)(2) provides that Chapter 13 filers may not "modify the rights of holders of secured claims" that are *secured only by a security interest in real property that is the debtor's principal residence."* (Emphasis added.) But this can be (and has been) read, in light of § 506(a), to prohibit modification of the mortgagee's rights only with respect to the portion of his claim that is deemed secured under the Code, see, *e. g., In re Hart,* 923 F. 2d 1410, 1415 (CA10 1991); *Wilson* v. *Commonwealth Mortgage Corp.,* 895 F. 2d 123, 127 (CA3 1990). If petitioner's construction of § 506(d) were applied consistently in this fashion to the Code's various chapters,

see 11 U. S. C. § 103(a) (providing that "chapters 1, 3, and 5 . . . [shall] apply in a case under chapter 7, 11, 12, or 13"), Chapter 7 would not appear unduly attractive. In any event, reorganization contains other enticements to lure a debtor away from Chapter 7. It not only permits him to maintain control over his personal and business assets, but affords a broader discharge from prepetition *in personam* liabilities. Compare, *e. g.*, 11 U. S. C. § 523 (listing numerous exceptions to Chapter 7 discharge) with 11 U. S. C. § 1328(a) (listing two exceptions to Chapter 13 discharge). Compare, *e. g.*, *Kelly* v. *Robinson*, 479 U. S. 36, 50 (1986) (restitution obligations imposed in criminal judgments nondischargeable in Chapter 7) with *Pennsylvania Dept. of Public Welfare* v. *Davenport*, 495 U. S. 552, 563–564 (1990) (such restitution obligations dischargeable in Chapter 13).

Finally, respondents and the United States find it incongruous that Congress would so carefully protect secured creditors in the context of reorganization while allowing them to be fleeced in a Chapter 7 liquidation by operation of § 506(d). This view mistakes the generosity of treatment that creditors can count upon in reorganization. There, no more than under Chapter 7, can they demand the benefit of postevaluation increases in the value of property given as security. See 11 U. S. C. §§ 1129(b)(2)(A) and 1325(a)(5) (permitting "cram-down" of reorganization plan over objections of secured creditors if creditors are to receive payments equal in present value to the cash value of the collateral, and if creditors retain liens securing such payments).[3]

---

[3] The election available to a secured creditor under § 1111(b)(2) to treat his undersecured claims as fully secured in a Chapter 11 reorganization notwithstanding § 506(a) does not affect this analysis, for an electing creditor is guaranteed under the reorganization plan only "property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims." 11 U. S. C. § 1129(a)(7)(B). In other words, "the present value of such payments [to the § 1111(b)(2) elector] need only equal the value of the secured creditor's interest in its collateral." 5 Collier on Bankruptcy ¶ 1111.02, pp. 1111–25 to 1111–26, n. 23 (15th ed. 1990).

## IV

I must also address the Tenth Circuit's basis for the decision affirmed today (alluded to by the Court, *ante,* at 414, but not discussed), that § 506 does not apply to property abandoned by the bankruptcy trustee under § 554, see 11 U. S. C. § 554. Respondents' principal argument before us was a modified (and less logical) version of the same basic point—viz., that although § 506*(a)* applies to abandoned property, § 506*(d)* does not. I can address the point briefly, since the plain-language obstacles to its validity are even more pronounced than those raised by the Court's approach.

The Court of Appeals' reasoning was as follows: § 506(d) effects lien stripping only with respect to property subject to § 506(a); but by its terms § 506(a) applies only to property "in which the estate has an interest"; since "[t]he estate has no interest in, and does not administer, abandoned property," § 506(a), and hence § 506(d), does not apply to it. *In re Dewsnup,* 908 F. 2d 588, 590–591 (CA10 1990). The fallacy in this is the assumption that the application of § 506(a) (and hence § 506(d)) can be undone if and when the estate ceases to "have an interest" in property in which it "had an interest" at the outset of the bankruptcy proceeding. The text does not read that way. Section 506 automatically operates upon all property in which the estate has an interest at the time the bankruptcy petition is filed.[4] Once § 506(a)'s grant of secured-creditor rights, and § 506(d)'s elimination of the right to "underwater" liens and liens securing unallowed claims have occurred, they cannot be undone by later abandonment of the property. Nothing in the statute expressly permits such an unraveling, and it would be absurd to imagine it. If, upon the collateral's abandonment, the claim bi-

---

[4] The estate "has an interest," of course, even in its overencumbered property. See 11 U. S. C. § 541(d) (providing that property for which the debtor holds legal title alone is "property of the estate" to the extent of that legal title). See also § 541(a)(1) (defining the bankruptcy estate to include "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case").

furcation accomplished by § 506(a) were nullified, the status of the creditor's allowed claim—*i. e.*, whether (and to what extent) it is "secured" or "unsecured" for purposes of the bankruptcy distribution—would be impossible to determine. Instead, the claim would have to be treated as either completely "secured" or completely "unsecured," neither of which disposition would accord with the Code's distribution principles. The former would deprive the secured claimant of a share in the distribution to general creditors altogether. See 11 U. S. C. § 726 (providing for distribution of property of the estate to unsecured claimants). The latter (treating the claim as completely unsecured) would permit the lienholder to share in the pro rata distribution to general creditors *to the full amount of his allowed claim* (rather than simply to the amount of the § 506(a)-defined "unsecured claim") while reserving his *in rem* claim against the security. Respondents' variation on the Tenth Circuit's holding avoids these alternative absurdities only by embracing yet another textual irrationality—asserting that, even though the language that is the *basis* for the "abandonment" theory (the phrase "in which the estate has an interest") is contained in § 506(a), and only applies to § 506(d) *through* § 506(a), nonetheless only the effects of § 506(d) and *not* the effects of § 506(a) are undone by abandonment. This hardly deserves the name of a theory.

## V

As I have said, the Court does not trouble to make or evaluate the foregoing arguments. Rather, in Part II of its opinion it merely describes (uncritically) "the contrasting positions of the respective parties and their *amici*" concerning the meaning of § 506(d), *ante,* at 416, and concludes, because the positions are contrasting, that there is "ambiguity in the text," *ante,* at 417. (This mode of analysis makes every litigated statute ambiguous.) Having thus established "ambiguity," the Court is able to summon down its *deus ex machina:* "the pre-Code rule that liens pass through bank-

ruptcy unaffected"—which cannot be eliminated by an ambiguous provision, at least where the "legislative history" does not mention its demise. *Ante,* at 417, 418.

We have, of course, often consulted pre-Code behavior in the course of interpreting gaps in the express coverage of the Code, or genuinely ambiguous provisions. And we have often said in such cases that, absent a textual footing, we will not presume a departure from longstanding pre-Code practice. See, *e. g., Midlantic Nat. Bank* v. *New Jersey Dept. of Environmental Protection,* 474 U. S. 494, 501 (1986); *Kelly* v. *Robinson,* 479 U. S., at 46–47. But we have *never* held pre-Code practice to be determinative in the face of what we have here: contradictory statutory text. To the contrary, where "the statutory language plainly reveals Congress' intent" to alter pre-Code regimes, *Pennsylvania Dept. of Public Welfare* v. *Davenport,* 495 U. S., at 563, we have simply enforced the new Code according to its terms, without insisting upon "at least some discussion [of the change from prior law] in the legislative history," *ante,* at 419.

For an illustration of just how plainly today's opinion is at odds with our jurisprudence, one need only examine our most recent bankruptcy decision. *Union Bank* v. *Wolas, ante,* p. 151. There also the parties took "contrasting positions" as to the meaning of the statutory text, but we did not shrink from finding, on the basis of our own analysis, that no ambiguity existed. There also it was urged upon us that the interpretation we adopted would overturn pre-Code practice with "no evidence in the legislative history that Congress intended to make" such a change. *Ante,* at 157. We found it unnecessary to "dispute the accuracy of [that] description of the legislative history . . . in order to reject [the] conclusion" that no change had been effected. "The fact," we said, "that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning."

434

*Ante*, at 157, 158.  And "the fact that Congress carefully reexamined and entirely rewrote the preference provision in 1978 supports the conclusion that the text of § 547(c)(2) as enacted reflects the deliberate choice of Congress." *Ante*, at 160.  What was true of the preference provision in *Wolas* is also true of the secured claims provisions at issue in the present case: Congress' careful reexamination *and entire rewriting* of those provisions supports the conclusion that, regardless of whether pre-Code practice is retained or abandoned, the text means precisely what it says.  Indeed, the rewriting here is so complete that, no matter how deeply one admires and venerates "pre-Code law," it is impossible to interpret § 506(d) in a manner that entirely preserves it— and the Court itself, for all its protestation of fealty, does not do so.  No provision of the former Bankruptcy Act, nor any pre-Code doctrine, purported to invalidate—across the board—liens securing claims disallowed in bankruptcy, see 11 U. S. C. § 107 (1976 ed.); see also 4 Collier on Bankruptcy ¶ 67 (14th ed. 1978), yet that is precisely what § 506(d), as interpreted by the Court today, accomplishes.

It is even more instructive to compare today's opinion with our decision a few years ago in *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235 (1989), which involved another subsection of § 506 itself.  The issue was whether § 506(b) made postpetition interest available even to those oversecured creditors whose liens were nonconsensual.  The Court of Appeals had held that it did not, because such a disposition would alter the pre-Code rule and there was no "legislative history" to support the change.  We disagreed.  The opinion for the Court began "where all such inquiries must begin: with the language of the statute itself." *Id.*, at 241.  We did not recite the contentions of the parties and declare "ambiguity," but entered into our own careful consideration of "[t]he natural reading of the [relevant] phrase," the "grammatical structure of the statute," and the "terminology used throughout the Code." *Id.*, at 241 and 242, n. 5.  Hav-

ing found a "natural interpretation of the statutory language [that] does not conflict with any significant state or federal interest, nor with any other aspect of the Code," *id.*, at 245, we deemed the pre-Code practice to be irrelevant. And whereas today's opinion announces the policy judgment that "[a]ny increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor," *ante*, at 417, in *Ron Pair* we were undeterred by the fact that our result was "arguably somewhat in tension with the desirability of paying all creditors as uniformly as practicable," 489 U. S., at 245–246. "Congress," we said, "expressly chose to create that alleged tension." *Id.*, at 246. Almost point for point, today's opinion is the methodological antithesis of *Ron Pair*—and I have the greatest sympathy for the Courts of Appeals who must predict which manner of statutory construction we shall use for the next Bankruptcy Code case.

* * *

The principal harm caused by today's decision is not the misinterpretation of § 506(d) of the Bankruptcy Code. The disposition that misinterpretation produces brings the Code closer to prior practice and is, as the Court irrelevantly observes, probably fairer from the standpoint of natural justice. (I say irrelevantly, because a bankruptcy law has little to do with natural justice.) The greater and more enduring damage of today's opinion consists in its destruction of predictability, in the Bankruptcy Code and elsewhere. By disregarding well-established and oft-repeated principles of statutory construction, it renders those principles less secure and the certainty they are designed to achieve less attainable. When a seemingly clear provision can be pronounced "ambiguous" *sans* textual and structural analysis, and when the assumption of uniform meaning is replaced by "one-subsection-at-a-time" interpretation, innumerable statutory texts become worth litigating. In the bankruptcy field

alone, for example, unfortunate future litigants will have to pay the price for our expressed neutrality "as to whether the words 'allowed secured claim' have different meaning in other provisions of the Bankruptcy Code." *Ante*, at 417, n. 3. Having taken this case to resolve uncertainty regarding one provision, we end by spawning confusion regarding scores of others. I respectfully dissent.