**In re Robert L. FREUDENHEIM,
Debtor.**

**Bankruptcy No. 91–12421 K.**

United States Bankruptcy Court,
W.D. New York.

Dec. 7, 1995.

---

**280**

Daniel F. Brown, Damon & Morey, Buffalo, New York, for Debtor.

Joseph W. Allen, Jaeckle, Fleischmann & Mugel, Buffalo, New York, for Creditor Fleet Bank.

## MEMORANDUM OF DECISION

MICHAEL J. KAPLAN, Chief Judge.

On the record in open court on November 14, 1995, this Court ruled that for purposes of cramming down a Chapter 11 Plan under 11 U.S.C. § 1129(b) over the objection of a creditor who holds a lien on the Debtor's real estate, the Debtor is not entitled to subtract the hypothetical costs of a hypothetical sale [1] from the collateral's fair market value for purposes of valuing the secured portion of a claim under 11 U.S.C. § 506(a). This memorandum explains that decision.

The issue is important in this case. The creditor has a junior lien on real estate that has a fair market value (by stipulation) of $2.3 million. If the secured portion of this creditor's $240,000 claim is computed by reference to the $2.3 million value without adjustment for hypothetical sale costs, then the value of that secured claim will be at least $70,000—an amount that is not "inconsequential" for purposes of 11 U.S.C. § 1111(b)(1)(B)(i). But if the $2.3 million figure is reduced by hypothetical costs of sale, then the secured claim of this creditor will be valued at zero or at an amount that would be "inconsequential." This creditor would like to have the option of making the § 1111(b) election.

The Court acknowledges the wealth of scholarship contributed by others regarding the proper measure of value of a secured claim under 11 U.S.C. § 506(a) for purposes of cramdown. The issue has been well and thoroughly examined by many authorities, most notably by several Circuit Courts which have held that the Debtor is not entitled to deduct the hypothetical costs of sale.[2] This Court concurs. The present memorandum does not purport to make any such scholarly contribution, but only to record one voice in ardent dissent from the position that the focus of inquiry ought to be what the creditor would realize from a sale of the collateral.[3]

That view might be appropriate for fixing adequate protection for the continuation of the automatic stay, but during cramdown under § 1129(b), a creditor's rights of foreclosure, sale, bidding-in and the like are not being delayed; rather they are being extinguished and replaced forever (if the plan is successfully completed) with lesser rights. For that purpose, the proper measure of value is not what the creditor would net in a hypothetical sale, but rather the value of the collateral "in the hands of the Debtor." In the view of this Court, the value of the collateral in the hands of the Debtor is what the Debtor would have to pay to replace this collateral.

It is submitted that those who focus on what the Debtor (or lienor) would net as a seller of the collateral at fair market value are in error. The Debtor should be viewed as redeeming the collateral from the lienor, not selling the collateral for the benefit of the

---

1. The term "hypothetical sale" is used because the Debtor's Plan proposes that the Debtor will retain the property.

2. *See, e.g., Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries, Inc.)*, 50 F.3d 72 (1st Cir.1995); *Metrobank v. Trimble (In re Donald Allen Trimble)*, 50 F.3d 530 (8th Cir.1995) (Chapter 13 case); *Associates Commercial Corp. v. Rash (In re Rash)*, 31 F.3d 325 (5th Cir.1994) (Chapter 13

case); *Huntington Nat'l Bank v. Pees (In re McClurkin)*, 31 F.3d 401 (6th Cir.1994) (Chapter 13 case); *Lomas Mortgage USA v. Wiese*, 980 F.2d 1279 (9th Cir.1992) (Chapter 13 case); *Brown & Co. Sec. Corp. v. Balbus (In re Balbus)*, 933 F.2d 246 (4th Cir.1991) (Chapter 13 case).

3. *See, e.g.,* Hon. James F. Queenan, Jr., *Standards for Valuation of Security Interests in Chapter 11*, 92 Com.L.J. 18 (1987).

lienor. If fair market value must have reference to the price at which a willing buyer would buy from a willing seller, then the Debtor should be viewed as the willing buyer, not the willing seller, and the Debtor thus ought not to benefit from hypothetical costs of sale.

Were this not so, at least two anomalies would result. First, there would be no compensation to the creditor for the loss of the opportunity to participate in the sale that would occur if it were permitted to foreclose or if the Debtor offered the property for sale under 11 U.S.C. § 363 (which would give the creditor a § 363(k) right to bid-in and offset). The creditor would have been stripped of those rights without compensation, and the creditor would suffer the further injury of being charged with the hypothetical cost of such a hypothetical sale in the calculation of the creditor's secured claim.

Second, the deductions from fair market price that the Debtor wants to use are hypothetical costs of a hypothetical sale, and in many cases there is no reason at all to believe that such costs would necessarily be incurred. Unlike the "Chapter 7 test" analysis required by such provisions as 11 U.S.C. § 1129(a)(7)(a)(ii), 11 U.S.C. § 1225(a)(4) and 11 U.S.C. § 1325(a)(4), there is no reason to contemplate how a reasonable disinterested person might go about the process of selling the collateral. In many instances, the supposition of a broker's commission, for example, would be unfounded, since insiders or creditors are often very much in the hunt to buy the collateral in a private sale or a foreclosure sale, if such a sale is in fact in the offing.

Most authorities on both sides of the question at Bar perceive the issue as arising out of a "tension" between the first sentence of 11 U.S.C. § 506(a) and the second sentence. There is no tension unless one concedes that "the value of [the] creditor's interest in the estate's. interest in [the] property" must of necessity be less than what a buyer would

pay for the property, and no such concession is warranted.

"It is readily apparent that as to appreciating property, a mortgage may be more valuable than the market value of the collateral at a given point in time." *In re Mahaner,* 34 B.R. 308, 310 (Bankr.W.D.N.Y.1983). That fact was more evident during the period of soaring appreciation in the real estate market, but was not lost on the United States Supreme Court when, in *Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992), it stated,

> We think ... that the creditor's lien stays with real property until the foreclosure. That is what was bargained for by the mortgagor and the mortgagee.... Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor—mortgagee bargain.

Although that was in a different context (the application of § 506(d) rather than § 1129 or § 1325), it should lay to rest any contention that the opportunity to participate in a sale, the power to bid-in and own, etc. are not elements of value that should command a difference in treatment of a creditor whose collateral is being offered for sale as opposed to one whose collateral will be retained and operated by the Debtor.[4]

The present decision is entirely consistent with this Court's rulings regarding the appropriate measure of value in other, similar contexts. Thus, for example, this Court has ruled that the allowed amount of the secured claim of an automobile lender in a Chapter 13 case under 11 U.S.C. § 1325(a)(5)(B)(ii) is best approximated by NADA "average trade-in" price rather than "average retail price" or "average wholesale price." "Average trade-in price" best approximates what the Debtor would have to pay for that precise automo-

---

4. *Cf.* Margaret Howard, *Stripping Down Liens: Section 506(d) and the Theory of Bankruptcy,* 65 Am.Bankr.L.J. 373 (1991) (erroneously concluding, prior to the Supreme Court decision in *Dewsnup,* that an undersecured lienor would not be denied any valuable property right when it is "cashed out" for the present fair market value of its collateral and denied the opportunity to participate in a sale thereof).

bile, as is and where is, since "wholesale" is a price among dealers, not available to consumer buyers, and "retail" includes elements of added value (such as by clean-up, fix-up, and perhaps a limited warranty) and dealer profit. *In re Rossow,* 147 B.R. 1 (Bankr. W.D.N.Y.1992). In the present case, the $2.3 million stipulated "fair market value" contains no such element and is the price that the Debtor would have to pay if it were a willing buyer of such property in an "as is" condition.

An analogy to today's ruling is found in decisions such as *Household Finance Corp. III v. Wilk,* No. CIV. 91–60556L, 1992 WL 165770 (W.D.N.Y. Feb. 13, 1992), which interpreted the Debtor's lien avoidance power under 11 U.S.C. § 522(f)(1)(A) as requiring that there be no reduction of fair market value of the Debtor's homestead for hypothetical costs and expenses of sale in determining whether (and the extent to which) there is value to the homestead in excess of exemptions, and therefore the extent to which the judgment lien cannot be avoided.

Again, the notion that a Debtor who gets to keep property indefinitely as a result of the bankruptcy process should be viewed as the willing buyer, rather than the willing seller, in the hypothetical sale contemplated in the concept of "fair market value" might not be appropriate to apply for other purposes. For example, if the § 362(a) automatic stay is being continued for a limited period of time, and it is necessary to determine the level of adequate protection that must be provided to the creditor who is being stayed from foreclosure, it might be appropriate to focus upon what the creditor would net if it were permitted to foreclose and sell now as opposed to later. The Court expresses no opinion today on that subject. Rather, the Court here emphasizes that the notion of "indubitable equivalence" (embodied in the § 1129(b)(2)(A)(iii) provision for cramming down secured creditors and the § 361(3) provision for adequate protection, both of which contemplate the Debtor retaining the collateral) had its origins in the case of *Metropolitan Life Insurance Co., et al. v. Murel Holding Corp., et al. (In re Murel Holding Corp.),* 75 F.2d 941 (2d Cir.1935), and that was a cramdown case, not an automatic stay case. Providing a secured creditor with the "indubitable equivalence" of its lien requires the bankruptcy court to modify that lienor's state law rights as little as possible, and provide substitute compensation where any modifications are made. When the bundle of rights that a secured creditor bargained for are not merely being deferred, but are being replaced with lesser rights over the secured creditor's objections, the Debtor should not be entitled to the super-added benefit of reducing the calculation of the secured creditors claim by the imposition of hypothetical costs of a hypothetical sale.

This result was SO ORDERED at hearing.