In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3492

ALEJANDRO PALOMAR, SR., and RAFAELA PALOMAR,

*Plaintiffs-Appellants,*

*v.*

FIRST AMERICAN BANK,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 12 C 2418—**Gary S. Feinerman**, *Judge.*

ARGUED MAY 21, 2013—DECIDED JULY 11, 2013

Before POSNER, MANION, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* Mr. and Mrs. Palomar filed for bankruptcy under Chapter 7 of the Bankruptcy Code in July 2011, and a trustee was appointed. A month after the filing the trustee reported that the estate in bankruptcy contained nothing that could be sold and yield money for the Palomars' unsecured creditors. So a discharge of their dischargeable debts was entered and in December the bankruptcy case was closed.

The day before the trustee issued his no-asset report the Palomars had filed in the bankruptcy court an adversary action against First American Bank, which held (and holds) a second mortgage on their home. The original amount of the loan secured by the mortgage was $50,000, but the current balance is unknown and the bank has not bothered to file an appearance in the adversary action. Another lender, LBPS (IBM Lender Business Process Services, Inc., recently renamed Seterus), had and has a first mortgage on the Palomars' home on which the unpaid balance when the Palomars filed for bankruptcy was $243,000—yet the home was valued then, according to an appraisal attached to the debtors' complaint, at only $165,000. The Palomars argue that the second mortgage was worthless and should therefore be "stripped off"—that is, dissolved by order of the bankruptcy court. As authority they cite 11 U.S.C. § 506(a). The accuracy of the appraisal has not been questioned, though the Palomars had an incentive to obtain a low appraisal in order to bolster their argument for the stripping off of the second mortgage.

By the time the adversary action was ready to be decided by the bankruptcy judge, the bankruptcy had been closed. The judge could have reopened it "to accord relief to the debtor," 11 U.S.C. § 350(b), as by stripping off a lien (if that would be proper relief), provided that the Palomars had not been responsible for a delay in pressing their suit that would have harmed the creditors (that is, provided that the Palomars had not been guilty of laches). *In re Bianucci*, 4 F.3d 526, 528 (7th Cir. 1993);

*In re Beaty*, 306 F.3d 914, 923 (9th Cir. 2002). But deciding that the adversary action was meritless, the judge refused to reopen the bankruptcy proceeding and instead dismissed the adversary action. The district court affirmed and the Palomars have appealed to us. First American Bank has not appeared.

So far as relates to the appeal, section 506(a) of the Bankruptcy Code states that "an allowed claim of a creditor secured by a lien on property . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." Section 506(d) states that "to the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void." *In re Tarnow*, 749 F.2d 464, 465-66 (7th Cir. 1984), explains that these provisions are best interpreted as confirming the venerable principle of *Long v. Bullard*, 117 U.S. 617, 620-21 (1886), that bankruptcy law permits a lien to pass through bankruptcy unaffected, provided that it's a valid lien and secures a valid claim ("an allowed secured claim"). The holder of such a claim can if he wants ignore the bankruptcy proceeding and enforce his claim by foreclosing the lien. But alternatively he can file the claim in the bankruptcy proceeding, which will be an unsecured claim to the extent that it exceeds the value of the collateral. The upside of this way of proceeding is that if the claim exceeds that value, yet the debtor has assets sufficient to enable the excess at least or a portion of it to be paid in satisfaction of an unsecured

claim, the creditor will be better off than by foreclosing his lien. The downside is that the claim may be disallowed, in which event the lien will be avoided; for all a lien is is security, so if there is nothing to secure, the lien is down the drain. The bankruptcy court's invalidation of a lien, if not reversed, will operate as collateral estoppel should the creditor later try to foreclose, that is, try to enforce the lien.

Note however that *partial* disallowance of a lien creditor's secured claim doesn't invalidate the lien, but merely shrinks it. "If a party in interest requests the [bankruptcy] court to determine and allow or disallow the claim secured by the lien under section 502 and the claim is not allowed, then the lien is void"—but only "to the extent that the claim is not allowed." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 357 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6313.

If, however, as *Tarnow* teaches when read alongside such later decisions as *In re Talbert*, 344 F.3d 555, 560-61 (6th Cir. 2003), and *Ryan v. Homecomings Financial Network*, 253 F.3d 778, 781-82 (4th Cir. 2001), the only lien voided by section 506(d) in whole or part is one securing a claim rejected in whole or part by the bankruptcy court, the statute has no application to this case. First American's claim was not rejected by the bankruptcy court—it filed no claim. No one did; this was a no-asset bankruptcy. And so the bank was free to foreclose its lien outside of bankruptcy. Nor is there any suggestion that had the bank filed a claim it would have been rejected. It hasn't foreclosed, yet only (we suppose) because at present the

Palomars' home is worth less (unless the appraisal is grossly inaccurate) than the sum of the first and second liens on it, the bank's lien being the second. In fact it's worth less than the first lien, that of LBPS alone. But someday the house may be "above water," at which point First American may decide to foreclose.

The holdings in *Tarnow*, *Talbert*, and *Ryan* are supported (as noted in *Talbert*, 344 F.3d at 560, and *Ryan*, 253 F.3d at 781-82) by the Supreme Court's post-*Tarnow* decision in *Dewsnup v. Timm*, 502 U.S. 410 (1992), which holds that section 506(d) does not allow the bankruptcy court to squeeze down a fully valid lien to the current value of the property to which it's attached. See *id*. at 417-18. That's the relief the debtor in this case is seeking. The only difference between this case and *Dewsnup* is that our debtors want to reduce the value of the lien to zero. They point to section 506(a), which makes a "claim of a creditor secured by a lien on property" a "secured claim" only "to the extent of the value of such creditor's interest in [the] property." That value, the Palomars note, currently is zero. But *Dewsnup* treated the undersecured loan in that case as a "secured claim" within the meaning of section 506(d), and in so doing denied that "the words 'allowed secured claim' must take the same meaning in § 506(d) as in § 506(a)." *Id*. at 417. The point of section 506(a) is not to wipe out liens but to recognize that if a creditor is owed more than the current value of his lien, he can by filing a claim in bankruptcy (rather than bypassing bankruptcy and foreclosing his lien) obtain, if he's lucky, some of the debt owed him that he could not obtain by foreclosure because his lien is worth less than the debt.

The Palomars point out that liens on residential property can be stripped off in bankruptcies under Chapter 13 of the Bankruptcy Code, the counterpart for individual debtors of Chapter 11, which governs corporate reorganizations. A Chapter 13 plan can "modify the rights of holders of secured claims, other than a claim secured only by security interest in real property that is the debtor's principal residence, or of holders of unsecured claims." 11 U.S.C. § 1322(b)(2). And despite the exception, courts allow a Chapter 13 plan to eliminate a secured junior claim (such as a claim secured by a second mortgage) against residential property if the security interest no longer has value because what the debtors owe holders of liens senior to this creditor's lien (the holder of a first mortgage for example) exceeds the value of the property. See *In re Bartee*, 212 F.3d 277, 292-95 (5th Cir. 2000); *In re McDonald*, 205 F.3d 606, 615 (3d Cir. 2000). That is what the Palomars want now, but to get it they would have had to file for bankruptcy under Chapter 13 rather than Chapter 7. The strip-off right in Chapter 13 is a partial offset to the advantages that Chapter 13, relative to Chapter 7, grants creditors, such as access to a larger pool of assets because the debtor must commit all disposable income for three to five years to repaying his unsecured debts. 11 U.S.C. § 1325(b)(1)(B).

The difference between Chapter 13 (also Chapter 11) and Chapter 7 is the difference between reorganization and liquidation. In the latter type of bankruptcy the debtor surrenders his assets (subject to certain exemptions) and in exchange is relieved of his debts (with certain exceptions), thus giving him a "fresh start." But in

a reorganization the assets are not sold—the enterprise continues—though ownership is transferred from the debtor to his creditors. Chapter 13 is only analogous to a reorganization; the debtor does not become a slave. But unlike what happens in a Chapter 7 bankruptcy, his assets are not sold; instead he pays his creditors, over a three- or five-year period, as much as he can afford. 11 U.S.C. § 1325(b). Often this makes the creditors better off than they would be in a liquidation, for the assets, though important to the debtor, may have little market value.

The Palomars point out that liens can sometimes be stripped off even in Chapter 7 bankruptcies. See 11 U.S.C. §§ 522(f), 722. The cited provisions relate, however, to liens on property that is exempt from creditors' claims. Section 522(f) allows the debtor to reduce a lien on exempt property so far as is necessary to preserve the exemption, while section 722 allows a debtor to redeem "tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt" by paying the current value of the lien. Both provisions support the "fresh start" policy of Chapter 7, consistent with the aim of bankruptcy law of balancing the bankrupt's interests against his creditors' interests. In any event, sections 522(f) and 722 are not available to the Palomars—and "fresh start" is not an ambulatory policy invokable whenever a debtor makes an appeal to judicial sympathy.

And if there were such a principle it wouldn't be applicable to this case. Given the gross disparity between the current market value of the Palomars' home and the

claims secured by it, First American Bank is unlikely, to say the least, to foreclose in the immediate or near future. For that would entail the bank's incurring legal expenses to obtain the ownership of property worth less than the first mortgage on the property; the bank would be compounding its loss. So all that failing to extinguish First American's lien does from a practical standpoint is deprive the debtors of the chance to make some money should the value of their home ever exceed the balance on LBPS's first mortgage. It is hard to see how the deprivation of so speculative a future opportunity could be thought to impair the debtors' ability to make a fresh *start*. The extinction of the lien would not enable them to obtain a new second mortgage (unless from a predatory lender) or otherwise improve their financial situation.

AFFIRMED.