**In re Bruce and Jennifer CHRISTIE, d/b/a Bruce Christie Sales, d/b/a Classic Computers, Debtors.**

**Bankruptcy No. 92–31039.**

United States Bankruptcy Court, E.D. Texas, Paris Division.

March 24, 1993.

---

Bill F. Payne, Moore, Payne & Clem, Paris, TX, for debtors.

Louis R. Strubeck, Jr., Fulbright & Jaworski, Dallas, TX, for creditor H. Drue Pirtle.

## MEMORANDUM OPINION GRANTING MOTION FOR RELIEF FROM STAY

C. HOUSTON ABEL, Chief Judge.

Before the Court is a Motion for Relief from Automatic Stay filed by H. Drue Pirtle ("Pirtle"). As both sides stated during the hearing, the facts regarding this motion are somewhat unique. After review-

ing the arguments, evidence presented and the relevant law, the Court is of the opinion that the motion should be GRANTED. The following constitutes that Court's findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) and 11 U.S.C. § 362.

## BACKGROUND

The Debtors on March 1, 1990, purchased from Pirtle a 14,000 square foot house situated on 16.760 acres of land ("Property") in Red River County, along with certain personal property contained within.[1] The total purchase price was $562,500. To facilitate the purchase, the Debtors executed two notes in favor of Pirtle in the amounts of $475,000 ("Home Note") and $87,500 ("Personal Property Note"). Additionally, a Deed of Trust was executed contemporaneously with the Home Note that requires, among other things, that the Debtors pay all taxes assessed against the Property.[2]

The Debtors have paid the Personal Property Note in full. However, starting with the mortgage payment due for July 1992, the Debtors have failed to make the monthly mortgage payments in accordance with the Home Note. The monthly payment on the Home Note is $5,104.37 per month.

The Debtors purchased the Property because of its capability of being used both as their personal residence and to operate their business. The Debtors' business primarily consists of serving as a consultant, selling and servicing computers and related accessories, and providing computer software training.[3] Further, the Debtors assert that their business includes the operation of a function resort[4] and the breeding of animals. With the exception of the Debtors, there are no employees.

As a result of Debtors' default under the Home Note and Deed of Trust, Pirtle began the process of foreclosing his lien against the Property on August 20, 1992, by sending the Debtors a notice of intent to accelerate. Shortly thereafter, the Debtors filed for protection under Chapter 11 on September 11, 1992.[5] The primary asset the Debtors sought to protect in bankruptcy, and the asset Pirtle seeks the stay lifted from, is the Property.

The Debtors assert that the reason they filed bankruptcy was because of defects with the Property which prohibit the Property from being utilized as intended. These alleged defects, according to the Debtors, have caused a reduction in cash flow. The Debtors filed a lawsuit in State Court, prior to the filing of bankruptcy, against Pirtle for damages relating to the alleged defects.[6] The outcome of this lawsuit, according to the Debtors, will not affect the success of their plan of reorganization ("Plan").[7]

## DISCUSSION

■ Pirtle seeks the lifting of the automatic stay pursuant to 11 U.S.C. § 362(d), which provides:

1. The Property is situated in a rural area and is clearly the Debtors' principal residence.

2. Taxes assessed against the Property for the years 1991 and 1992 are owing, totaling over $10,000.

3. The selling of computers and related accessories is facilitated through a catalogue.

4. Debtors assert that they originally intended to use the Property as a resort at the time of purchase. However, it was not until after the filing of bankruptcy, and shortly before the hearing, did the use of the Property as a resort actually occur. The use of the Property as a function resort was based on the premise that executives would come out to the Property and use its leisure environment to hold board meetings, conferences or training seminars.

5. Debtors' large amount of unsecured debt precludes their qualifying for Chapter 13. *See* 11 U.S.C. § 109(e).

6. Also prior to the filing of bankruptcy, Pirtle's wife filed a lawsuit against the Debtors for libel. Both lawsuits are currently stayed.

7. Page 17 in Debtors' Disclosure Statement.

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Because Pirtle is seeking the relief from the stay, he has the burden of proof as to the Debtors' equity in the Property, with the Debtors having the burden of proof on all other issues. 11 U.S.C. § 362(g). Pirtle alleges that grounds exist to lift the stay under both § 362(d)(1) and (2). However, because most of the arguments concerned § 362(d)(2), and because § 362(d)(2) is dispositive of the motion before the Court, the Court will only examine it.

### § 362(d)(2)

### A. EQUITY

Pirtle met his burden of establishing that the Debtors have no equity in the Property when the Debtors conceded this fact. However, what was not agreed to by the parties is the value of the Property and how much Pirtle is undersecured. Valuation is important in this motion to lift stay because the Debtors' Plan will "lien strip" the mortgage on the Property down to the Property's current value. By lien stripping the mortgage, the Debtors will be able to greatly reduce their financial obligations to Pirtle and enhance the feasibility of their Plan.

The Debtors' appraiser, Gary Brown ("Brown"), testified that the fair market value of the Property is $116,000.00. This value was derived using the cost approach because there were no available comparable sales in the area for a house of this size. Brown's analysis was generally based upon *Marshall and Swift Residential Cost Handbook* as a guide to determine how much it would cost to reproduce the improvements on the Property. Based upon this data, Brown testified that it would cost approximately $600,000 to reproduce the improvements on the Property new, with the value of the land being $12,500. However, because of depreciation, the value of the improvements are approximately $104,000.[8]

Pirtle offered his own expert, Preston Combest ("Combest"), as to the value of the Property. Combest has fifteen years of experience as a real estate broker and builder in the area and has appraised real estate in the past. Combest agreed with Brown that the cost approach is the best analysis to use in valuing the Property. However, Combest testified that the fair market value is approximately $421,000. This valuation was derived after taking into account any needed repairs to the Property. These repairs, according to Combest, will cost approximately $20,000. This estimation of the cost of repairs was based upon a prior inspection of the Property and his experience as a builder in the area.

After reviewing the testimony of the two experts, the Court finds Pirtle's expert to be more credible. Brown's valuation is based greatly upon what he perceived to be unusual conditions or defects with the Property that are expensive to repair and that make the Property unmarketable unless fixed. However, based on Brown's own admission, he has no experience as a structural engineer or structural analysis. Additionally, Brown tended to use the "upper-end" in terms of how much it would cost to make any needed repairs. Therefore, his analysis concerning the amount of

---

**8.** Brown testified that if physical, functional and external depreciation are considered, the Property has depreciated approximately $496,000. Brown stated the high depreciation was warranted because of the repairs that need to be done to the Property. Brown testified that it would cost approximately $175,000 to repair any deferred maintenance and correct any present construction problems.

repairs that are needed and the cost of making them is highly questionable.

To the contrary, the Court finds Combest's testimony as to the value more credible. Combest recognized in his valuation of the Property that the Property does need repairs. Combest adjusted his valuation based upon his personal knowledge as a builder in the area and not on a general valuation guide as Brown did. This background as a builder provides Combest with much more extensive knowledge regarding the extent of repair the Property needs and the cost. Further, the Court finds that the amount of depreciation in Brown's appraisal to be greatly exaggerated, especially in light of his own admission that needed repairs may be made to the Property for approximately $175,000.[9]

However, because the Court finds that Combest was somewhat conservative regarding the needed repairs to the Property, the Court believes that an additional $40,000 should be added to Combest's estimation of cost of repairs. This would bring the total cost of repairs under Combest's estimation to $60,000. After subtracting this additional $40,000 from Combest's valuation, the Court finds the value of the Property to be $381,000.[10] Since it was stipulated between the parties that the Debtors owes approximately $440,000 on the Home Note, the Debtors are clearly without any equity in the Property.

## B. IS THE PROPERTY NECESSARY TO AN EFFECTIVE REORGANIZATION

■ This part of the test is the most difficult because of the dearth of case law regarding the necessity of a house for an effective reorganization when the house is the *sole* place of business. It is the Debtors' burden of proof to establish that the Property is necessary for an effective reorganization. 11 U.S.C. § 362(g)(2). Further, the Court is very aware of the strong

protection given a debtor's homestead in the State of Texas.[11] *See* Tex. Const. art. XVI, § 50. Though there are no cases on point, there are at least two Chapter 11 cases which have tangentially addressed the issue as to when a house is necessary for an effective reorganization.

In 1980, a New York bankruptcy court was confronted with the issue whether a second office at the debtor's home was necessary for an effective reorganization. *In re Sulzer*, 2 B.R. 630 (Bankr.S.D.N.Y. 1980). In that case, the debtor, a psychoanalyst, maintained an office in New York City as well as in his home. Because the debtor owed back rent, his landlord was threatening to evict him from the office in the city. As a consequence, the debtor's home became very important to his business in that the debtor was seeing between 50% and 75% of his patients at his home. In its holding, the court found that the home was "not directly instrumental to his relationship with his patients or the gross income derived from his practice." *In re Sulzer*, 2 B.R. at 635. The court further stated:

> [I]f the debtor's financial reorganization is dependent upon his maintaining a rent-free office, then this is not the type of luxury to which this court should subscribe within the context of debtor relief. The debtor may continue his practice in any convenient rentable office from which he may generate funds to implement a plan of reorganization. However, the mortgagee cannot, in good faith, be compelled to underwrite the debtor's desire to conduct his practice from his home.

*In re Sulzer*, 2 B.R. at 635. Therefore, the court lifted the stay even though the home was generating income as a second office.

■ In 1991, Judge Monroe, in the Western District of Texas, was confronted with

---

**9.** Brown depreciated the total reproduction cost of the improvements new approximately 83%, while Combest only depreciated the improvements 38%.

**10.** This valuation is limited to the purpose of this hearing.

**11.** It was not discussed by either side whether the Property qualifies as a rural homestead. Though the Court questions the Property's eligibility to qualify as a rural homestead, a ruling regarding this issue is reserved for another day.

the issue as to whether the debtors' home was an essential key for a successful reorganization in light of the fact that the home was not used to produce income. *In re Wilks*, 123 B.R. 555 (Bankr.W.D.Tex.1991). In *Wilks*, the court noted that the debtors' main objective under their plan of reorganization was to reduce the lien amount on their home to its current market value. Though the court passed on addressing the legitimacy of this objective, the court held that the home was not necessary for an effective reorganization. *In re Wilks*, 123 B.R. at 562. In reaching this conclusion, the court adopted and analyzed the following objective factors:

   a) the nexus between the residence and the debtor's generation of income;

   b) the supply of other suitable housing in the area;

   c) the length of time the debtor has been in Chapter 11;

   d) whether the residence is a financial burden to the debtor;

   e) whether the Chapter 11 was filed solely to stay foreclosure of the home; or

   f) whether there is some special reason or circumstance for the debtor to maintain ownership of the residence.

*In re Wilks*, 123 B.R. at 559. This Court concurs with Judge Monroe as to the appropriateness of these factors and accordingly will use them as well.

## NEXUS

It is undisputed that the Debtors' house is used in the production of income. The Debtors are using the house not only as an office, but to store any equipment that they may have.[12] The Debtors' principal business, consulting and catalogue sales of computers and related accessories, is operated out of an office located in the house.

■■■ However, there is no probative evidence that the house is necessary for the Debtors to generate income. *See infra.* In order for the Debtors to keep the stay in place, the Debtors must show that retention of the house is an integral factor in the success of their plan. *La Jolla Mortgage Fund v. Rancho El Cajon Associates*, 18 B.R. 283 (Bankr.S.D.Cal.1982). The fact that bankruptcy was filed to save the house does not make the house necessary for an effective reorganization. *In re Gregory*, 39 B.R. 405, 410 (Bankr. M.D.Tenn.1984). Therefore, though the Property may currently be used by the Debtors to generate income, it is not integral to their business.[13]

## OTHER SUITABLE HOUSING

■■■ In determining whether other suitable housing is available, courts should measure the fungibility of the property in question against the debtor's *minimum* living requirements. *In re Gregory*, 39 B.R. at 411. If a debtor can effectively reorganize in another location, such as in a rented apartment, then the debtor's house is not necessary for an effective reorganization. *Id.* However, a debtor may succeed on this point by showing that "because of changes in interest rates, the absence of credit, the property's proximity to work, schools or churches, moving costs, or the availability of alternative housing," the debtor cannot secure another place to live and work. *Id.*

As to this factor, the Debtors failed to meet their burden that there is a genuine need for the house. The mainstay of the Debtors' business is clearly fungible and may be operated out of a much smaller and less extravagant house, or out of rented space in almost any office complex. In fact, before the Debtors relocated their business to Texas from California, the Debtors operated their business from a 2,000 square foot rented office. The Debtors' testimony that the business in Texas is greatly different from that in California, and therefore needs more space, is not

---

**12.** Debtors testified that relatively little equipment, and no inventory, is currently located in the house.

**13.** Though Debtors assert that all of the house is integral to the operation of their business, they have never claimed any expense associated with the house as a business expense on their taxes.

credible.[14] The evidence presented clearly shows that the essence of the business has not changed since the relocation—computer sales and service. Any actual change in the business is to occur *in the future*. Therefore, there is nothing about the Debtors' business which would require that it be operated out of this very large house when it had previously been operated out of a much smaller rented space.

The Debtors' attempt to argue that the Property is needed as a function resort is not persuasive.[15] First, though the Property may have been purchased with this in mind, it was never used as such until after the filing of bankruptcy and shortly before this hearing. And then, only once. Second, this one time use of the Property as a resort brings in other greater concerns. The insurance currently on the Property is a standard home owners insurance policy and does not cover guests being brought onto the Property for business purposes. In fact, there is some evidence indicating that the insurance on the Property is to be canceled because of this unreported use of the Property to the insurer. Third, the Debtors' Plan fails to state whether appropriate insurance will be obtained in order for the Property to be used as a resort. Additionally, the Plan fails to provide whether the Debtors can even afford the cost of insurance in light of the increased liability that will need to be carried. Fifth, many of the amenities on the Property which will make the Property suitable as a resort, according to the Debtors, need to be repaired.[16] However, the Plan fails to adequately account for the cost of making any repairs to these amenities.

And sixth, the Debtors have no true track record of operating a resort, especially the luxurious kind envisioned. As noted previously, up until shortly before the hearing, the Debtors had never used the Property as a resort. There is no financial history to support that the Property could be used as a resort profitably. Neither is there evidence that the Debtors even know how to operate a resort. Further, there is no information regarding how many employees will be needed to operate the Property as a resort in light of the fact the Debtors' advertisement of the Property as a resort states that there is a "caring staff who will work with you". This Court is not amenable to permit the Debtors to "experiment" using a creditor's collateral in a new business venture. Especially, in a business venture on which the Debtors are heavily relying upon to raise sufficient revenue to fund their Plan. Accordingly, the Court finds the Debtors' ability to generate a profit from operating the Property as a resort to be highly questionable and speculative.[17]

---

**14.** Debtors' argument that the business in Texas is different from that in California because the business no longer engages in "retail sales" as it did in California is not persuasive. Though it is true that the Debtors no longer maintain a store front to sell computers and the related accessories, the Debtors continue to sell computers from their house. What has changed since the move to Texas is the mode of selling. The Debtors now sell through a catalogue versus using a retail location. Therefore, in essence, the business has not changed.

**15.** The use of the Property as a function resort is the Debtors' primary argument why they need the Property for an effective reorganization. The Debtors argue that they need all 14,000 square feet of the house and the amenities located on the Property for the use of the Property as a resort to succeed. According to the Debtors, when the Property is operated as a resort, all rooms will be used by the guests, including the master bathroom in the Debtors' bedroom.

**16.** Located on the Property is a swimming pool, tennis court, gazebo, and a spacious lawn. Each amenity, according to the Debtors, needs some type of repair.

**17.** The Court notes that the Debtors' Plan also envisions raising significant income from the breeding of cattle and horses. As with the use of the Property as a resort, this is an activity which had not occurred prior to the filing of bankruptcy. To avoid fully discussing this new use of the Property as was done regarding the use of the Property as a resort, the Court will simply find the profitability of this use to be questionable and speculative as well.

As with the resort, this use of the Property appears to be alleged solely for the purpose of establishing that the Debtors must have this Property in order to reorganize. This is apparent in light of the fact that the Debtors currently maintain only three head of cattle and one horse on the Property.

Further, the Debtors have failed to establish that there is no reasonable alternative house available that could be used to operate the business as it was operated prior to bankruptcy. Debtors only attempted to show that there is no available alternative housing in the area for the type of business they plan to operate *in the future.* The Debtors' business can easily be operated in a space much smaller than the 14,000 square foot house. The Debtors even admitted during questioning that phone orders from catalogue sales could be received elsewhere.[18] Overall, the Debtors' business is a fungible one that may be relocated to a less extravagant location. There is no probative evidence that there is no suitable housing available from which the Debtors can operate their business and reside. Nor is there probative evidence that the Debtors could not operate their business from an office in another location while they reside in a house they can afford—as they did in California. As long as there is more affordable alternatives available to the Debtors, this Court has grounds to lift the stay. *In re Wilks,* 123 B.R. at 560 (*citing In re McIntyre,* 96 B.R. 65, 67 (Bankr.S.D.Miss.1988)).

LENGTH OF TIME IN CHAPTER 11

The Debtors have been in Chapter 11 for a relatively short period. However, because the Plan anticipates lien stripping the mortgage well beyond the value of the house given herein, the Court finds that it is clearly not confirmable as proposed. Based upon the financial information provided to the Court, the Court has serious concerns whether the Debtor could even fund a plan based upon a $381,000 valuation of the Property, and discounting the

purely speculative revenue that may be derived from unproven business ventures.

Further, the Plan does not appear to be fair and equitable. Though the only other secured creditor of the Debtors will be paid in full,[19] all the creditors with disputed unsecured claims will receive nothing.[20] This is troubling in light of the fact the Debtors' Plan provides for a 2% return to all undisputed unsecured creditors, but the Plan fails to list any such creditors. All unsecured creditors are listed as having a disputed claim.[21] Therefore, the only debts which will be repaid under the Plan are those which are secured, while title to all the assets are to reinvest in the Debtors.[22]

FINANCIAL BURDEN TO THE DEBTOR

Clearly, the mortgage payment on the Property greatly exceeds the Debtors' financial ability to pay. This is most evident by the extent the Debtors would need to lien strip the mortgage in order to reduce their financial obligation to successfully· fund the Plan. Based on the proposed Plan, the Debtors will reduce their mortgage payment from approximately $5,104 per month to $1,669 per month. The Plan predicts that the reduction in the mortgage payment, along with revenue from other business ventures, will result in a positive net cash flow.

However, because the valuation herein assigned to the Property is much higher than that proposed in the Plan, the Court has reservations as to whether the Debtors could fund the Plan. Based upon a $381,-000 valuation, the Court finds it unlikely that the mortgage payments would be reduced enough to result in a positive net

---

**18.** Debtors' concern that they need to be close to their business at all times in order to handle phone calls that come late at night may be addressed by keeping a business phone line in their house or by using an answering service.

**19.** This creditor has a lien on the Debtors' Lexus.

**20.** Debtors have listed approximately 73 disputed unsecured creditors in their schedules with claims totaling $778,530.10.

**21.** The unsecured portion of the Home Note is listed in the Plan as a disputed unsecured claim which will receive nothing.

**22.** Included in the assets which are to reinvest in the Debtors is any potential recovery from the Debtors' lawsuit against Pirtle. The Plan makes no arrangement to distribute any portion of the recovery with the unsecured creditors. As such, there is a potential violation of the absolute priority rule. *See* 11 U.S.C. § 1129(b)(2).

cash flow.[23] Additionally, if the speculative projected revenue from any new business ventures is set aside, the financial burden of the mortgage debt becomes even greater. With the debt owing to Pirtle being the largest owed by the Debtors to any one creditor, it is self evident that this obligation creates a severe financial burden to the Debtors.

CHAPTER 11 FILED TO STAY FORE-CLOSURE

As with the prior factor, this factor is clearly self evident. The Debtors testified that they filed for bankruptcy in order to save their house. The filing occurred approximately 20 days after the Debtors received notice of Pirtle's intent to accelerate the debt owed because of non-payment. Therefore, the sole intent for the filing of Chapter 11 was to stay foreclosure of the house.

SPECIAL REASONS OR CIRCUM-STANCES

Regarding this factor, the Court finds no special reasons or circumstances for the Debtors to maintain ownership of the Property. To the contrary, the equities weigh in favor of lifting the stay. The fact that the Debtors have filed a lawsuit against Pirtle for alleged defects on the Property does not warrant that the stay should remain in effect. The Debtors stated in their Disclosure Statement that the success of their Plan is not dependent upon the Debtors prevailing with the lawsuit. Accordingly, any potential recover from the lawsuit will be a bonus to the Debtors. Further, the Court notes that any alleged defect will only affect the use of the Property as proposed and will not effect the pre-bankruptcy use of the Property.

**CONCLUSION**

The Debtors are attempting to use a procedure that is not available to debtors in either Chapter 7 or 13—lien stripping. *See Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (debtor may not lien strip a creditor's lien on real property

in Chapter 7); *In re Nobleman,* 968 F.2d 483 (5th Cir.1992) (debtor may not bifurcate a secured claim on a principal residence in Chapter 13), *cert. granted,* —— U.S. ——, 113 S.Ct. 654, 121 L.Ed.2d 580 (1992). As such, this Court believes it should more strictly apply the standard as to whether the Property is necessary for an effective reorganization. *In re Wilks,* 123 B.R. at 562.

The application of the above objective factors clearly warrant that the stay should be lifted to permit Pirtle to foreclose on his lien. In analyzing the Debtors' business prior to bankruptcy, there clearly is nothing unique about the house which requires the Debtors to operate their business from it. The house is merely a luxury item which the Debtors are seeking to keep and which is not essential to the business. *See In re Sulzer,* 2 B.R. at 634–5. The Debtors are attempting to keep an asset which their business cannot financially support at this time. The fact that it is convenient for the Debtors to operate the business from their house does not make the house necessary for an effective reorganization. Additionally, the Debtors failed in their burden of establishing that there is no alternative housing available for the type of business they operated pre-bankruptcy.

Further, the Debtors admittedly have no equity in the house and they appear to be exaggerating their lack of equity in order to maximize the extent in which they can lien strip the mortgage in the Plan. The treatment of Pirtle's claim in the Plan, along with the financial burden of maintaining the Property, suggests that an effective reorganization is not in prospect within a reasonable time. *See United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988).

Therefore, in accordance with this Memorandum Opinion, an order will be entered simultaneously by the Court GRANTING

---

**23.** Using the $381,000 valuation with the terms proposed in the Plan (15 year amortization at 7.5%), the new monthly payment will be approximately $3,532 per month.

Pirtle's Motion for Relief from the Automatic Stay.