## In re BEN FRANKLIN RETAIL STORES, INC., et al., Debtors.

### Bankruptcy Nos. 96 B 19482, 96 B 19489, 96 B 19483, 96 B 19494, 96 B 19501 and 96 B 19497.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Nov. 4, 1997.

---

Allan S. Brilliant, Christopher J. Horvay, Jeffrey M. Schwartz, Holleb & Coff, Chicago, IL, for Debtors.

Stephen E. Garcia, Jay A. Steinberg, Hopkins & Sutter, Chicago, IL, for Fibre–Craft Materials Corp.

Lawrence Fisher, Gardner, Carton & Douglas, Chicago, IL, for Interim Trustee.

Michael Desmond, Dean C. Harvalis, Dept. of Justice, Chicago, IL, for U.S. Trustee.

Gerald F. Munitz, Alan P. Solow, Randall L. Klein, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL, J. Andrew Rahl, Jeffrey L. Glatzer, Anderson, Kill

& Olick, P.C., New York City, for Jackson Nat. Life Ins. Co. and Foothill Capital Corp.

## MEMORANDUM OPINION

RONALD BARLIANT, Bankruptcy Judge.

The debtors in these six related chapter 11 cases are a holding company and its operating subsidiaries. The cases have been jointly administered since shortly after their commencement. About eleven months after filing, they were converted to cases under chapter 7 of the Bankruptcy Code, and the United States Trustee appointed an interim trustee for the holding company and another interim trustee for all the other cases. At their separate meeting of creditors, the creditors of the holding company elected a permanent trustee without dispute. At their meeting, creditors of the operating companies requested a joint election in all five cases and separate elections in three of the five. (The other two cases have no unsecured creditors.) Those elections resulted in the apparent election of a common permanent trustee, but were disputed by the United States Trustee and the interim trustee. The Court, during a series of hearings over about six weeks, overruled the objections to the joint election of a common trustee and other objections, and he is now serving as permanent trustee of all five cases. Because several of the objections, particularly to the holding of a joint, or consolidated, election and to the solicitation and proxy process,

raise novel issues, the Court is issuing this opinion regarding those issues.

## BACKGROUND

Shortly after their filing on July 26, 1996, the Court ordered that these six related cases be jointly administered under Bankr. Rule 1015(b).[1] One law firm represented all six debtors. A committee of unsecured creditors of the five operating companies was formed. The chairman of that committee was Fibre–Craft Material Corp. That committee retained Hopkins and Sutter to represent it, and was actively involved in the chapter 11 cases. The only significant creditors of the parent company, Ben Franklin Retail Stores, Inc., case No 96 B 19482 ("Retail") are its bondholders. Because of the different interests in that estate, the United States Trustee organized a separate committee of bondholders, represented by a different law firm.

Despite mighty efforts, the chapter 11 cases failed. They were converted to chapter 7 cases on June 24, 1997. The United States Trustee treated the parent's case, Retail, differently than the operating companies' cases. He appointed a separate interim trustee in the Retail case, and convened a separate meeting of creditors under § 341[2] on August 25, 1997. At that meeting, the bondholders requested an election under § 702[3] and elected Howard Korenthal as

1. Bankr.Rule 1015(b) provides, in relevant part, "If a joint petition or two or more petitions are pending in the same court by or against (1) a husband and wife, or (2) a partnership and one or more of its general partners, or (3) two or more general partners, or (4) a debtor and an affiliate, the court may order a joint administration of the estates. Prior to entering an order the court shall give consideration to protecting creditors of different estates against potential conflicts of interest."

2. Unless otherwise indicated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101, et. seq.

3. Section 702 provides:
 (a) A creditor may vote for a candidate for trustee only if such creditor—
 (1) holds an allowable, undisputed, fixed, liquidated, unsecured claim of a kind entitled to

distribution under section 726(a)(2), 726(a)(3), 726(a)(4), 752(a), 766(h), or 766(I) of this title;
 (2) does not have an interest materially adverse, other than an equity interest that is not substantial in relation to such creditor's interest as a creditor, to the interest of creditors entitled to such distribution; and
 (3) is not an insider.
(b) At the meeting of creditors held under section 341 of this title, creditors may elect one person to serve as trustee in the case if election of a
trustee is requested by creditors that may vote under subsection (a) of this section, and that hold at least 20 percent in amount of the claims specified in subsection (a)(1) of this section that are held by creditors that may vote under subsection (a) of this section.
(c) candidate for trustee is elected trustee if—
 (1) creditors holding at least 20 percent in amount of the claims of a kind specified in subsection (a)(1) of this section that are held by

permanent trustee. The results of that election have not been disputed.

The United States Trustee appointed Lawrence Fisher as interim trustee in each of the five remaining cases: Ben Franklin Stores, Inc. ("Stores"), No. 96 B 19489; Ben Franklin Crafts, Inc. ("Crafts"), No. 96 B 19493; Ben Franklin Transportation, Inc. ("Transportation"), No. 96 B 19494; Ben Franklin Realty II, Inc. ("Realty II"), No. 96 B 19497; Ben Franklin Realty, Inc. ("Realty"), No. 96 B 19501 (collectively, the "Subsidiaries"). Stores was the primary operating company. The scheduled non-insider claims in each case that were not listed as disputed, unliquidated or contingent are as follows: [4]

| | |
|---|---|
| Stores | $39,077,850.21 |
| Crafts | $ 2,637,061.23 |
| Transportation | $ 2,076,120.83 |
| Realty | 0.00 |
| Realty II | 0.00 |
| Total | $43,791,032.27 |

During the eleven months of chapter 11 joint administration, many creditors filed proofs of claim. Unfortunately, it is not possible to know for sure in which cases all the proofs of claim were intended to be filed. Pursuant to order of court, Price Waterhouse maintained the claims docket. It kept a single docket for all six cases, and many of the proofs themselves are unclear as to the case. We do know, however, that Retail had virtually no creditors except the bondholders, and that the total proofs filed by creditors other than bondholders are $32,234,176.15. Of that number, $13,092,306.66 in claims had been scheduled, and therefore are included in the scheduled claims listed above.[5] Netting out those duplicates leaves a total universe of claims potentially eligible to vote in the Subsidiaries' five jointly administered cases of $62,932,901.76.[6] It takes 20% to request an election and at least that percentage must vote under § 702. Twenty percent of $62,932,901.76 is $12,586,580.35.

Prior to the meeting of creditors, the chair of the chapter 11 committee of creditors, Fibre–Craft Material Corp., through its chief

---

creditors that may vote under subsection (a) of this section vote; and

(2) such candidate receives the votes of creditors holding a majority in amount of claims specified in subsection (a)(1) of this section that are held by creditors that vote for a trustee.

(d) If a trustee is not elected under this section, then the interim trustee shall serve as trustee in the case.

**4.** The parties agreed that the schedules and proofs of claim, adjusted for duplications, reflected the total claims, subject to objections to specific claims. Section 702(a) restricts voting to creditors (excluding insiders and creditors with materially adverse interests) holding "allowable, undisputed, fixed, liquidated, unsecured" claims. Retail holds a large claim and the interim trustee contended that it should count as part of the universe even though major shareholders of debtor corporations are "affiliates," and therefore "insiders." § 101(2),(31). He argued that the Retail chapter 7 trustee (as representative of the estate) holds the stock in the Subsidiaries "in a fiduciary ... capacity without sole discretionary power to vote such securities," and is therefore excluded from the definition of "affiliate." § 101(2)(A)(i). That exclusion, however, is not of all fiduciaries, but only of fiduciaries without the power to decide how to vote—in other words, nominal holders. See 2 Collier on Bankruptcy, ¶ 101.02 (15th Ed. Rev'd 1997). The Retail trustee is a fiduciary, but he is the only person with the power to decide how to vote the estate's shares. Retail's claim is therefore not part of the § 702(a) universe of potentially eligible claims,

and is not included in the claims discussed in this opinion.

**5.** In a chapter 11 case, creditors whose claims are scheduled and not listed as disputed, unliquidated or contingent are deemed to have filed proofs of claim, and need not actually file proofs of claim to have their claims allowed. § 1111(a). It is therefore not surprising that so few creditors filed proofs.

**6.** The Court generally agrees with *In re Michelex, Ltd.,195* B.R. 993 (Bankr.W.D.Mich.1996) that the universe is not statutorily limited to filed proofs of claim, but with a caveat. The difficult issue raised by § 702(a) is one of proof. Here and in *Michelex,* the parties stipulated to the accuracy of the schedules. There was therefore no need to determine, for example, whether schedules would be admissible evidence for purposes of proving that universe, perhaps under Rule of Evid. 803(24)("trustworthy" exception to hearsay). In *In re Lake States Commodities, Inc.,* 173 B.R. 642 (Bankr.N.D.Ill.1994), there were no schedules. As the court explained, it would have been impossible to prove the amount of claims without time consuming investigation because of the condition of the debtor's books. So while this Court agrees with *Michelex,* it does not disagree with the result in *Lake States.* A court must decide an election dispute on the most reliable evidence that can be presented in a reasonable time. In such a case, "a reasonable time" is very short. In this case, the proof problem was resolved by the parties' stipulations.

financial officer, George Helmbock, solicited proxies from creditors scheduled as holding undisputed, liquidated, unsecured claims against the Subsidiaries. Fibre–Craft is such a scheduled creditor and filed a $635,-903.07 proof of claim against Stores before the meeting of creditors.

Mr. Helmbock has been actively involved in these bankruptcy cases. For nearly a year he acted as chairman of the chapter 11 unsecured creditors' committee. Steve Garcia, a partner in the law firm of Hopkins & Sutter, represented the creditors' committee. Prior to conversion, Mr. Helmbock had asked Mr. Garcia what the unsecured creditors' options would be if there were a conversion. One of the options Mr. Garcia advised him about was the creditors' right to elect a trustee of their choice. Upon conversion, Mr. Helmbock asked Mr. Garcia to assist him with that process. Mr. Garcia agreed and acted as the proxy forwarder.

Mr. Garcia prepared the solicitation letters and Special Powers of Attorney.[7] The solicitation letters advised creditors that the cases had been converted, that Mr. Helmbock had acted as chairperson of the creditors' committee in the chapter 11 cases, and that unsecured creditors were entitled to elect a trustee. It asked for their proxy to vote for a trustee and on any other matters that might arise at the meeting. The solicitation letter did not advise creditors that the interim trustee, appointed by the United States Trustee, would remain in place if there were no election, nor did it state that there might be a consolidated election for a common trustee in all five cases. Mr. Garcia used the official form for a special power of attorney, the proxy. It authorized the holder of the proxy to "vote in my behalf on any question that may be lawfully submitted to creditors at such meeting or adjourned meeting, and for a trustee or trustee [sic] of the estate of the debtor."[8]

Special Powers of Attorney were submitted by 1) 129 unsecured creditors that had filed proofs of claims in the aggregate amount of $10,381,671.60; and 2) 361 unsecured creditors that had not filed proofs of claim but were listed on the Subsidiaries' schedules as having undisputed, liquidated, unsecured claims in the total amount of $8,172,003.75.[9]

At the meeting of creditors, held on August 27, 1997, Mr. Helmbock requested the election of a trustee on behalf of Fibre–Craft and as the holder of the special powers of attorney. Mr Helmbock requested a consolidated election for all the Subsidiaries. Recognizing a possible objection to that request, he also requested separate elections for Stores, Crafts and Transportation. In all four elections, Mr. Helmbock voted the claims he controlled in favor of Jay A. Steinberg as trustee. Three creditors, holding claims for which proofs had been filed totaling $5,185,815.23, appeared on their own behalf and voted for Mr. Steinberg. Three other creditors who already had given proxies, and whose votes were counted in the proxy group, appeared and affirmed their support for Mr. Steinberg. One creditor that had a filed proof of claim for $241,296 voted in favor of Mr. Fisher.

This Court ruled that under Bankr.Rule 2003(b) only creditors that had filed proofs of claim were eligible to vote. The proxy votes of scheduled creditors with claims totaling $8,172,003.75 were not counted because they did not file proofs of claim. Therefore, before adjusting for specific objections, the total votes in favor of Mr. Steinberg to be the common trustee were $15,567,486.83. The interim trustee and United States Trustee objected to a consolidated election. The interim trustee also filed numerous and varied objections to all of the claims that were voted

7. Separate letters and separate powers of attorney were prepared for the Stores, Crafts and Transportation cases, the only difference being the captions. Since there were no creditors in either Realty or Realty II, there was nobody to solicit proxies from in those estates.

8. The official form contains the words "trustee or trustees."

9. These numbers are different than those in the United States Trustee's report of disputed election. One scheduled creditor listed as one of the proxies that had not filed a proof of claim, had timely filed a proof of claim in the amount of $291,833.

in favor of Mr. Steinberg.[10] The Court ruled on all objections. After deducting disallowed votes, the Court found that creditors with total claims significantly greater than the required 20% of potentially eligible claims had voted for Mr. Steinberg, assuming the propriety of a consolidated election. Since the Court decided that the consolidated election was proper, Mr. Steinberg is now the trustee in all the five Subsidiaries' cases.

Many of the objections decided during these hearings will not be discussed in this opinion. However, because the United States Trustee joined in the objection to the consolidated election and because the Court found little case authority on the propriety of consolidated elections and the form of solicitations and proxies, it will address those issues.

## DISCUSSION

### Consolidated Elections

These cases were ordered to be jointly administered. They have not been substantively consolidated. The United States Trustee and interim trustee argue that the Bankruptcy Code and rules do not permit consolidated elections, in which the votes of the creditors in all the jointly administered cases are cast in a single election for a common trustee for all the jointly administered cases. Rather, they argue, the law requires a separate election in each of the jointly administered cases, unless the cases have been substantively consolidated. Otherwise, they warn, the creditors in one case could dictate the trustee in another case in which they have no claims. Here, for example, two of the cases, Realty and Realty II have no unsecured creditors. The United States Trustee and interim trustee consider it an outrage that creditors in the other cases can impose a trustee on estates with no creditors.

■■■ When cases are substantively consolidated, the estates are merged and creditors in all the consolidated cases have claims against the same pool of assets. Joint administration, on the other hand, does not alter the substantive rights of creditors. The estates remain separate, and a creditor with a claim in one case has no right to distribution from the estate in any other case.[11] But joint administration does mean the cases can be administered together in ways "that may aid in expediting the cases and rendering the process less costly." Advisory Committee Note, Rule 1015.

■■■ The duty of a trustee is to administer the estate, primarily by liquidating assets and distributing the proceeds. See, § 704. The election or appointment of a trustee does not alter substantive rights of creditors or change the character of the estate. Selection of a common trustee does not result in a substantive consolidation of the cases to any extent, but may well "aid in expediting the cases and rendering the process less costly." And the court may not even order joint administration until after it has considered "protecting creditors of different estates against potential conflicts of interest." Bankr.Rule 1015(b). Election of a common trustee is therefore consistent with the concept of joint administration and with Rule 1015, whether or not the cases are substantively consolidated.

■■■ Once the court has decided to order that estates be jointly administered, Bankr. Rule 2009 controls the selection of a trustee or trustees. Rule 2009(a) provides: "If the

---

**10.** The interim trustee was advised by Mr. Helmbock before the meeting that there were sufficient votes to elect a permanent trustee. He did not know, however, which creditors would vote in favor of the election. Consequently, he prepared objections to every one of the approximately 600 proofs of claim filed in these cases. At the meeting he filed objections to every one of the claims that voted, except the one claim that voted in favor of him.

**11.** The code itself recognizes the distinction, albeit indirectly. The code in § 302(a) allows a

"joint case" to be filed by a husband and wife with a single petition. But subsection (b) makes it clear that even in a joint case there are separate "debtors' estates" (emphasis added), except to the extent the court consolidates them. So long as the estates are kept separate, § 726 assures that the property of each debtor's estate will be distributed only to creditors of that debtor. A § 302 joint case is therefore administered as a single case, but not to the extent of altering the substantive rights of creditors.

court orders a joint administration of two or more estates pursuant to Rule 1015(b), creditors may elect a single trustee for the estates being jointly administered." Under the objectors' argument, that clause must be read as "the creditors of each such estate may elect the same trustee as the creditors of each other estate being jointly administered." The Court rejects that construction. For one thing, it would render the rule superfluous. Nothing in the Bankruptcy Code or rules prohibits the creditors in two different cases from voting for the same trustee, whether or not the cases are jointly administered.

The more natural reading of the language of Rule 2009(a) is that "the creditors of the estates being jointly administered may elect a single trustee in a single election." In the rule, the word "creditors" comes after the phrase "joint administration of two or more estates" and before "the estates being jointly administered." It is more natural to read "creditors" to be the creditors of all the estates (one creditor body), rather than creditors of each such estate (two or more creditor bodies).

Moreover, this Court's reading of the Rule best carries out the purpose of joint administration to save expense of administration, but the objectors' reading wholly defeats that purpose. It has long been recognized that joint administration, and the appointment of a common trustee, are favored means to save expense. In *Matter of International Oil Company,* 427 F.2d 186, 187 (2nd Cir.1970), the court reversed two lower courts that had ordered separate trustees for corporate affiliates, refusing "to saddle these estates with the expense of separate trustees and trustees' attorneys. . . ." Although the court did not express the standard it was applying, it is clear that it found it to be an abuse of

discretion for the lower courts to have required separate trustees on the facts of that case. *International Oil* was cited by the drafters of Rule 2009 for the proposition that "economical and expeditious administration of two or more estates may be facilitated not only by the selection of a single trustee for a partnership and its partners, but by such selection whenever estates are being jointly administered pursuant to Rule 1015."

The election of a common trustee for jointly administered cases carries out that goal of "economical and expeditious administration." But under the argument of the United States Trustee and interim trustee, such an election would be impossible unless each creditor body musters the necessary 20% vote. In this case, two of the cases do not have unsecured creditors, so there could never be an election of a common trustee. As the United States Trustee pointed out, there is no procedure defined by the rules to allow the court to authorize the election of a common trustee. The result, if the objectors were right, would be that, notwithstanding the rule makers' preference for a common trustee to save expense, there would be no way to achieve that result in these cases, and it would be difficult in other cases.[12] There is, however, neither reason nor need to conclude that the rule makers intended to make the favored result difficult or impossible to achieve. Rather, Rule 2009(a) achieves their purpose by authorizing joint elections in cases the court has already ordered to be jointly administered.

The history behind Rule 2009 strongly supports this reading. In the 1973 Rules, under the Bankruptcy Act of 1938, Rule 210 allowed the court to approve the election of a common trustee by the creditors of even one of the jointly administered estates.[13] In fact,

12. The United States Trustee may appoint a single trustee for all jointly administered cases. Rule 2009(c). If there is no election, that person would become trustee of all the cases. Under the objectors' argument, creditors who want a common trustee would have to muster the necessary support in each case to override the United States Trustee's choice, which would be impossible here, and difficult in other cases. So creditors would be required to choose between the efficiency of a common trustee or having the

trustee they want. Burdening creditor franchise in that way is surely not a purpose of Rule 2009.

13. Rule 210 provided in relevant part:
(a) *Election of Single Trustee for Estates Being Jointly Administered.*—If the court orders a joint administration of 2 or more estates pursuant to Rule 117(b), it may approve election of a single trustee by the creditors of one or more of the bankrupts for the estates being jointly administered.

the language of subdivision (d) of Rule 210 assumed that there had been one election for jointly administered cases, but required the judge, before approving the election, to be satisfied that creditors of the separate estates would not be prejudiced.

There are important differences between practice under the Act and practice under the current Code. Under the Act, the judge presided at the meeting of creditors and appointed trustees. So what the United States Trustee sees as a procedural hole in the current rules did not exist under the 1973 rules. The judge, under the old regime, presided at the meeting where the election took place and could make a decision as to the propriety of having the trustee elected by one creditor body be the trustee for all the jointly administered cases. If he disagreed with the creditors, he had the power to appoint trustees for the separate estates. A major goal of the Bankruptcy Code, however, was to remove judges from the administration of estates. Under current practice, therefore, the judge is prohibited from participating in the meeting of creditors and does not appoint trustees. §§ 341(d); 701.

There is no reason to presume, however, that the drafters intended the result to be different under Rule 2009 than under the prior rule. Nothing in the advisory comments so suggests, and the Supreme Court instructs that we should not presume a substantial change in law absent a clear indication that such a change was intended. *Dewsnup v. Timm*, 502 U.S. 410, 433, 112 S.Ct. 773, 786–87, 116 L.Ed.2d 903 (1992). Here, there is no such indication. Rather, Rule 2009 can be read to be a continuation of the former practice, allowing for the abolition of the court's administrative functions.

(b) *Right of Creditors To Elect Separate Trustee.*— Notwithstanding entry of an order of joint administration pursuant to Rule 117(b) the creditors of any bankrupt may elect a separate trustee for his estate as provided in Rule 209(a).

(c) *Appointment of Trustees for Estates Being Jointly Administered.*—If the creditors do not elect a trustee under subdivision (a) or (b) of this rule, the court may appoint one or more trustees for the estates being jointly administered.

(d) *Potential Conflicts of Interest.*—Before approving the election or appointment of one trustee for estates being jointly administered as pro-

Old rule 210 provided for court *approval* of the election of a common trustee. It did not provide that the court could have appointed the same person elected in one case as trustee in the others (which would have been superfluous, since the judge had that power anyway). Further, the advisory committee comment to Rule 210 cited *International Oil*, the second circuit decision that lower courts had erred by appointing separate trustees absent strong evidence of conflicts of interest. Rule 210, therefore, allowed the joint election of a common trustee, subject to court disapproval only where circumstances clearly required separate trustees.

The procedure under current Rule 2009, as construed by this Court, is not much different. Rule 2009(a), like its predecessor, allows the creditors of one or more jointly administered cases to elect a trustee for all the cases.[14] The right to judicial review is preserved by Rule 2009(d), which allows the court to order the selection of separate trustees "[o]n a showing that creditors or equity security holders of the different estates will be prejudiced by conflicts of interest of a common trustee. . . ." The only substantial difference between practice under the Act and current practice, therefore, is consistent with the overall scheme of the Code to remove the court from administration, and limit judicial involvement to the resolution of disputes. As before, creditors may elect a common trustee, without separate elections in each case. As before, the right to judicial review is preserved. As before (accepting *International Oil* as controlling law, as the advisory committee did), the court is authorized to reject the common trustee only on a showing of conflicts of interest. The only differences are procedural: the court does not review the election of a common trustee

vided in subdivision (a) or (c) of this rule the court must be satisfied that the creditors of the different estates will not be prejudiced by conflicts of interest of the trustees.

14. Mathematically, it is not possible to have 20% of all creditors of two or more estates without at least also having 20% of the creditors of one estate. So it does not matter that Rule 2009 does not carry over the "creditors of one or more of the bankrupts [i.e., debtors]" language from former Rule 210.

unless a party in interest brings the matter to the court.[15]

On this reading, the procedural hole observed by the United States Trustee disappears. In the first instance, it is up to the creditors of the jointly administered cases, acting as a single body, to decide if the circumstances warrant a common trustee. There is no requirement for prior court approval. And the interests of all creditors are protected. Contrary to the fears of the objectors, there is no substantial risk that creditors in small cases would be oppressed by creditors in a larger jointly administered case. The right of the creditors of each separate case to elect a separate trustee is preserved by Rule 2009(b).[16] Assume estate A has creditors with claims of $100,000,000, and they all vote for a common trustee. Assume further that estate B has claims of $100. A single creditor with a claim of $20 could bring about the election of a separate trustee for estate B.

Moreover, as discussed above, the court can order separate trustees on a showing of conflicts of interest. Absent such conflicts, there is not likely to be good reason "to saddle these estates with the expense of separate trustees and trustees' attorneys...." *International Oil*, 427 F.2d, at 187. Indeed, the issue of election of a common trustee is not even reached until the court has determined under Rule 1015(b), after considering the risk of conflicts of interest, that the estates should be administered jointly. Furthermore, Rule 2009(e) assures the preservation of the substantive distinctions among the estates by requiring the common trustee to maintain separate accounts. That prevents a joint election from resulting in a back door substantive consolidation.

Finally, the objectors' reading of Rule 2009(a) would lead to absurd results in a number of possible cases, including this one. For example, if spouses file a joint case under § 302, there is little question that creditors could elect a common trustee in a joint election. But if they file separate petitions, resulting in separate cases, even if the court orders joint administration, the objectors could see no way to have a joint election. So if the husband's creditors did not show up at the meeting of creditors there would be no election in his case. The wife's creditors would then have to choose between exercising their franchise or saving expense. No such dilemma would face the creditors in the § 302 joint case, but no reason suggests itself for the difference.

These cases present another example of the absurdity of the objectors' position. Two cases have no creditors, but do have assets. The proceeds of the sale of those assets will flow to the Stores estate (which owns the stock in Realty and Realty II), to the benefit of the creditors of Stores. Plainly, those creditors are the only unsecured creditors with an interest in the administration of Realty and Realty II, and they would ultimately pay the extra cost of separate trustees. Yet the objectors would deny them any remedy.

Of course, no reading of a rule could be correct if it were inconsistent with the Bankruptcy Code. The objectors argue that this Court's reading of Rule 2009(a) fails that test. The Court disagrees. Nothing in § 702 precludes a joint election in jointly administered cases. It is true that subsections (b) and (d) refer to "trustee in the case," but in the Bankruptcy Code "the singular includes the plural." § 102(7). The election of a common trustee, no more than the appointment of a common trustee by the United States Trustee, has no effect on substantive rights; therefore, Rule 2009(a) does not run afoul of 28 U.S.C. § 2075. Further, as noted above, *Dewsnup* prohibits us from reading § 702 as changing prior law absent clear evidence of such a Congressional intent. There is no such evidence.

For all these reasons, the Court has held that the election of Mr. Steinberg as common trustee of the five jointly administered Subsidiaries' cases in a single, consolidated or

---

**15.** This is consistent with the general rule that the court has no involvement in the election process unless there is a dispute. Rule 2003(d)

**16.** Rule 2009(b) provides: "Notwithstanding entry of an order for joint administration pursuant to Rule 1015(b) the creditors of any debtor may elect a separate trustee for the estate of the debtor as provided in § 702 of the Code."

joint election was authorized by the bankruptcy rules.

### Solicitation Process and Proxies

The interim trustee objected to the solicitation process, and raised a number of specific objections to the solicitation letter and the proxies. The Court will address some of those objections below. At the outset, however, it is necessary to comment on the overall solicitation and voting process. This process cannot be considered in a vacuum; it must be evaluated in light of the particular facts of these cases and the overriding goals of the election process.

The goal of the Bankruptcy Code and rules related to election of a chapter 7 trustee is to encourage creditor participation, while preventing domination by creditors who hold claims insignificant in amount or who are adverse to the general creditor body. But, unlike other kinds of elections, bankruptcy trustee elections are rare, which means that few lawyers have experience with them, and there is little guidance in the rules and case law. Trustee elections also happen with little time for preparation. Achieving the goal of the law may, therefore, require looking to the substance rather than the form of the process. Technical deficiencies that do not, under the circumstances, create a realistic prospect of substantive deficiencies should not be allowed to defeat the fairly expressed will of creditors.

These cases operated under Chapter 11 for nearly one year as jointly administered cases. Mr. Helmbock served as the chairman of the sole creditors committee of the Subsidiaries before conversion. As the chairman of that committee, he was the only business person unsecured creditors were likely to deal with and thus the person they would look to for information regarding the progress of these cases. The unsecured creditors viewed these cases as one bankruptcy case and generally did not distinguish between the different entities, as evidenced by the confusion found in the claims register. Nearly 500 creditors submitted proxies. Seven creditors, in addition to Fibre–Craft, appeared at the § 341 meeting. Six and Fibre–Craft supported the election of Mr. Steinberg to be the common trustee. Only one voted for Mr. Fisher.

Despite the mailing of the solicitation materials to all creditors, not one joined in the interim trustee's objections. These circumstances are relevant to the review of the process and the specific objections.

### Form of Solicitation Letter

Mr. Fisher objects to the form of the solicitation letter, generally arguing that it did not contain sufficient information. He objects to the failure to mention that a consolidated election might be held and that the interim trustee would become the permanent trustee if there were no election. This Court found no cases addressing the requirements for the solicitation letter. The bankruptcy rules only require that the solicitation be in writing. Bankr.Rule 2006(c).

Fibre-Craft argued that the solicitation letter should be approved unless the Court finds that it contains a material misrepresentation. This Court, however, rejected that standard and instead concluded that it could not approve any solicitation materials if it found them materially misleading.

Although this Court agrees that the solicitation letter could have given creditors more information, it cannot find that the letter was misleading under the existing circumstances. There has been no showing that creditors would have acted differently had they been given the information the interim trustee complains was missing. Nor is there any reason to believe they would have. The creditors knew Mr. Helmbock and had relied on him to represent their interests throughout the bankruptcy process. They understood there would be an election and because the cases had always been jointly administered, with one law firm, one committee and one unified proceeding, they had reason to expect that it would be an election of a common trustee. More likely, they chose to leave it to Mr. Helmbock to represent their interests, and would have done so even if they had been told about the interim trustee and the details of the election process.

### Form of Proxy

*Proxies Did Not Authorize a Consolidated Election*

The interim trustee objected to the form of the proxies because they did not specifically

authorize a consolidated election. Mr. Fisher argues that a power of attorney must be strictly construed and because it only referred to one estate and one debtor, the power cannot be used to vote for a trustee in multiple estates.

The power of attorney granted the holder "full power of substitution" with the ability to vote "on any question that may be lawfully submitted to creditors at such meeting ... and for a trustee or trustee of the estate of the debtor." Although the power of attorney did not specifically authorize a vote in a consolidated election, as this Court has previously ruled, the request for a consolidated election was lawful and thus an issue that could be "submitted to creditors" at the meeting. Moreover, the proxy followed the official form for a special power of attorney, and since this Court has determined that a consolidated election will be held unless a separate election is requested, the official form must be construed as consistent with the bankruptcy rules.

*Conflict Between Caption and Proof of Claim*

That only one claims·register has been maintained for the six related cases ·has resulted in several problems. Although the claims register contains a column to designate the case or cases in which the claim has been filed, in many instances the information is inaccurate.[17] Not surprisingly, frequently the caption on the proxies did not correspond to the proofs of claim.

Moreover, the interim trustee objected to Fibre–Craft soliciting creditors of any estate other than Stores. The interim trustee argued that since Fibre–Craft was not itself a creditor of any of the other Subsidiaries, it could not solicit proxies from those creditors. This Court agreed and sustained that objection. Bankr.Rule 2006 does not authorize joint solicitation. Rather Rule 2006(c) permits only "a creditor owning allowable unsecured claims against *the estate*" to solicit proxies. Applying that language literally, Fibre–Craft could not solicit proxies from creditors of other estates.

In accordance with that ruling and this Court's order to file a supplement to the record setting forth the number of claims in this category, the interim trustee filed a list of 11 proxies totaling $959,854.88 that he contends had been improperly solicited as the creditor's claim was against an estate other than Stores. Fibre–Craft filed a response with documentation establishing that some of the creditors were actually creditors of Stores. This Court reviewed the evidence submitted and found the following proxies invalid:

| Creditor | Case | Amount of Proxy Disallowed |
|---|---|---|
| American Bus. Credit | Crafts | $ 448.54 [18] |
| Artcraft, Inc. | Crafts | $ 4,762.74 |
| Biehl Elec., Inc. | Transp. | $ 2,040.76 |
| Bill Rusciolelli | Crafts | $ 52,500.00 |
| Brice Road Assocs. | Crafts | $284,228.93 |
| Commonwealth Elec. | Crafts | $ 16,414.79 |
| Jay/Barr Advertising, Inc. | Crafts | $ 1,696.09 |
| Total | | $362,091.85 |

The interim trustee objected to several other claims in this category because either the proxy or the proof of claim referenced a case other than Stores. However, several of the claims were for lease rejection damages

---

17. It was fairly easy to discern the errors. The parent company has no creditors other than the bondholders. Most of the unsecured debt is in the Stores case. However, many of the trade creditors filed claims listing either the name or the case number of the parent. In other instances the claims list all six estates.

18. The interim trustee argued that the vote of this creditor should be disallowed in its entirety, which would have resulted in a reduction of $11,996.57. However, Fibre–Craft established that it had voted only the unsecured portion of that claim or $448.54. Accordingly, that was the only amount deducted from claims voted under this objection.

and the lease attached to the claim clearly established that the lease, and hence the claim, was with Stores.[19] The objections to those votes were therefore overruled. In several other instances the proof of claim referenced the Retail case, or referenced all six case numbers. By looking to the schedules filed in Stores, which the parties stipulated are accurate, this Court was able to determine that the claims were against Stores. Notwithstanding that the proxy or the proof of claim referenced the wrong estate, this Court also overruled those objections. The Court therefore deducted $362,091.85 from the claims voted in favor of Mr. Steinberg as trustee.

*Improper or No Notary or Acknowledgment*

██ Rule 9010(c) requires a proxy to be notarized or acknowledged. Several of the proxies were notarized, but incorrectly. In several instances the proxy was acknowledged by a notary rather than an agent of the corporation. In other instances there was an individual rather than a corporate acknowledgment. This Court found these errors harmless and overruled them. *See In re Eddie Haggar Ltd., Inc.,* 190 B.R. 281, 286 (Bankr.N.D.Tex.1995). Where a proxy was neither acknowledged nor notarized, the Court sustained the objection and disallowed the vote: $2,713.77 proxies were disallowed in this category.[20]

### CONCLUSION

For these reasons, and other reasons stated during the several hearings, the Court determined that Mr. Steinberg had been duly elected trustee of the five Subsidiaries' estates.

**19.** Most lease rejection claims, however, were excluded from the universe of potentially eligible claims, and therefore were not allowed to be voted, because the court granted the interim trustee's objection that the landlords did not claim actual damages, but only the maximum permitted by § 502(b)(6). The claims were therefore not undisputed, liquidated claims.

**20.** The proxy given by Bill Rusciolelli in the amount of $52,500 was also not signed or acknowledged. However, it was disallowed for improper solicitation by Fibre–Craft; the claim was against Crafts.