In re LEHMAN BROTHERS HOLDINGS INC. et al., Debtors.

Swedbank AB (PUBL), Appellant,

v.

Lehman Brothers Holdings Inc. and Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., Appellees.

No. 10 CV 4532 (NRB).

United States District Court, S.D. New York.

Jan. 27, 2011.

Claude D. Montgomery, Lee Papachristou Whidden, Paul C. Gunther, Salans LLP, New York, NY, for Appellant.

Richard Pearson Krasnow, Weil, Gotshal & Manges LLP, New York, NY, for Appellee LBHI.

Wilbur F. Foster, Jr., Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for Appellee Committee of Unsecured Creditors of LBHI.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Appellant Swedbank AB (publ.) ("Swedbank") appeals from a memorandum and order of the United States Bankruptcy Court (Peck, J.), entered on May 5, 2010, granting the motion of debtor Lehman Brothers Holdings Inc. ("LBHI") for an order enforcing the automatic stay against Swedbank and compelling Swedbank to return post-petition funds to LBHI. The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. ("Committee") joins LBHI in opposing the appeal.

For the reasons stated herein, the decision below is affirmed.

## *BACKGROUND*

LBHI and its affiliated debtors (collectively, the "Lehman Debtors") commenced a Chapter 11 case on September 15, 2008. This appeal arises out of that well-known case and relates to a dispute between LBHI and one of its creditors, Swedbank.

Swedbank and the Lehman Debtors had a multifaceted relationship that long predated the Lehman Debtors' Chapter 11 case. For example, LBHI was a party to an International Swaps and Derivatives Association ("ISDA") Master Agreement between LBHI and Swedbank, dated No-

vember 29, 2004 ("LBHI Master Agreement").[1] Additionally, between 1996 and 2004, Swedbank and certain LBHI affiliates entered into other ISDA Master Agreements. LBHI was a guarantor with respect to this latter set of agreements (together with the LBHI Master Agreement, the "Master Agreements"). Finally, LBHI maintained a general deposit account with Swedbank in Stockholm, Sweden ("Swedbank Account"). LBHI opened the account, which is denominated in Swedish Krona ("SEK"), in January 2008.

The Master Agreements include certain provisions that are relevant to this dispute. Specifically, the Master Agreements define a voluntary or involuntary bankruptcy filing as an "Event of Default." The Master Agreements further provide that an Event of Default: (1) triggers the early termination of the Master Agreements; and (2) grants the non-defaulting party a right of setoff.

As noted above, the Lehman Debtors filed a Chapter 11 petition on September 15, 2008. On that date, the balance in the Swedbank Account was SEK 2,140,897.40. Following the bankruptcy filing, Swedbank placed an administrative freeze on the Swedbank Account. As a result of the freeze, LBHI could not withdraw funds but was able to make deposits or wire transfers into the account. In the days and weeks to follow, LBHI and others deposited an additional SEK 82,765,466.45 (approximately $11.7 million) into the Swedbank Account.

On November 27, 2008, Swedbank informed LBHI that it intended to setoff LBHI's pre-petition debts, which arose un-

der the Master Agreements, against the funds in the Swedbank Account, including the SEK 82.7 million that was deposited post-petition. Although LBHI contested Swedbank's right to take such action, Swedbank reaffirmed its position in a letter dated January 30, 2009.

The Lehman Debtors filed a motion to enforce the automatic stay and to compel Swedbank to return the funds in the Swedbank Account on January 22, 2010. Following briefing and oral argument, the Bankruptcy Court granted the Lehman Debtors' motion, ordered Swedbank to immediately release the administrative freeze and to return the funds to LBHI, and denied Swedbank's motion for a stay pending appeal. Swedbank appeals from the Bankruptcy Court's memorandum decision and related order, each dated May 5, 2010.

## DISCUSSION

### I. Standard of Review

 When reviewing a Bankruptcy Court's decision, we "accept[ ] its factual findings unless clearly erroneous but review[ ] its conclusions of law de novo." *DG Creditor Corp. v. Dabah (In re DG Acquisition Corp.)*, 151 F.3d 75, 79 (2d Cir.1998); *see also Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods.)*, 209 F.3d 125, 128 (2d Cir.2000). Because this appeal raises issues of law, our review is de novo.

### II. Issues Presented

The issues presented on appeal are: (1) whether Swedbank's proposed setoff of LBHI's pre-petition obligations against

**1.** ISDA is a trade organization of participants in the market for over-the-counter derivatives. ISDA has created a standardized contract, the so-called ISDA Master Agreement, which functions as an umbrella agreement and governs all swaps between the parties to the ISDA Master Agreement. *See generally Aon Fin. Prods., Inc. v. Societe Generale*, 476 F.3d 90, 93 n. 4 (2d Cir.2007); *K3C Inc. v. Bank of Am., N.A.*, 204 Fed.Appx. 455, 459 (5th Cir. 2006).

LBHI's post-petition deposits was prohibited by section 553 of the Bankruptcy Code, which permits the offset of "mutual" pre-petition obligations; (2) whether Swedbank's proposed setoff was permissible under sections 560 and 561 of the Bankruptcy Code ("Safe Harbor Provisions"), which govern the right to liquidate, terminate, or accelerate swap agreements and master netting agreements; and (3) whether the Bankruptcy Court correctly ruled that Swedbank violated the automatic stay by placing a freeze on LBHI's post-petition funds.

We agree with Judge Peck's answers to these issues for the reasons set out in the Bankruptcy Court's opinion and thus affirm his ruling.

### III. The Legislative History of the Safe Harbor Provisions Does Not Support Offsetting a Creditor's Pre–Petition Claims Against a Debtor's Post–Petition Assets.

In affirming Judge Peck's decision, we write further only to address Swedbank's argument on appeal that the legislative history supports its construction of the Safe Harbor Provisions. We disagree with Swedbank.

### A. Statutory Text

By way of background, three principal statutory provisions are relevant to this analysis. Section 553 provides, in relevant part:

> [e]xcept as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor *that arose before the commencement of the case* under this title against a claim of such creditor against the debtor *that arose before the commencement of the case* . . .

11 U.S.C. § 553(a) (emphasis added). The requirement that a setoff be limited to a pre-petition debt against a pre-petition claim did not find its genesis in section 553. Rather, at least a century's worth of bankruptcy law has limited setoffs to mutual obligations. *See, e.g., Gray v. Rollo,* 85 U.S. 629, 633–34, 18 Wall. 629, 21 L.Ed. 927 (1873) (mutuality required under the Bankruptcy Acts of 1800 and 1867); *McCollum v. Hamilton Nat'l Bank,* 303 U.S. 245, 248, 58 S.Ct. 568, 82 L.Ed. 819 (1938) (mutuality required under the Bankruptcy Act of 1898).

Section 560, first enacted in 1990, specifies rights that parties to swap agreements have when a swap counterparty files for bankruptcy. It provides, in relevant part:

> [t]he exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 560. Section 561 confers similar rights upon parties to master netting agreements. Pursuant to section 561, which was enacted in 2005, a party may:

> cause the termination, liquidation, or acceleration of or to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more (or the termination, liquidation, or acceleration of one or more) . . . (5) swap agree-

ments; or (6) master netting agreements . . .

*Id.* § 561(a). Furthermore, section 561 expressly provides that the rights of a party to a master netting agreement are limited to that party's rights under the Code provisions that govern the underlying agreements. *Id.* § 561(b)(1) ("A party may exercise a contractual right described in subsection (a) to terminate, liquidate, or accelerate only to the extent that such party could exercise such a right under section 555, 556, 559, or 560 for each individual contract covered by the master netting agreement in issue.").

Swedbank's arguments turn on the relationship among section 553 and the later-enacted Safe Harbor Provisions.[2]

### B. Legislative History

■ It is axiomatic that "[w]hen Congress amends the bankruptcy law, it does not write 'on a clean slate.'" *Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (quoting *Emil v. Hanley,* 318 U.S. 515, 521, 63 S.Ct. 687, 87 L.Ed. 954 (1943)). Rather, Congress legislates in light of the legal principles in existence at the time. *Dewsnup,* 502 U.S. at 419, 112 S.Ct. 773. As is relevant to this dispute, the mutuality requirement has existed for more than a century.

■ When a party argues that Congress has made a fundamental change to a well-settled legal principle, courts often look to legislative history. As the Supreme Court of the United States commented in a related context:

this Court has been reluctant to accept arguments that would interpret the [Bankruptcy] Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.

*Dewsnup,* 502 U.S. at 419, 112 S.Ct. 773. Thus, if Congress had intended to eliminate the fundamental principle of mutuality, we would expect some discussion of this change in the legislative history. *See id.* ("[T]o attribute to Congress the intention to grant a debtor the broad new remedy . . . without the new remedy's being mentioned somewhere in the Code itself or in the annals of Congress is not plausible . . .").

■ On appeal, Swedbank concedes that but for the Safe Harbor Provisions, its actions would be unauthorized. Swedbank also admits that the post-petition deposits into the Swedbank Account were made fortuitously and were not required by the terms of the Master Agreements. However, Swedbank contends that sections 560 and 561 specifically authorize the offset of LBHI's pre-petition debts against the post-petition funds in the Swedbank Account. According to Swedbank, the legislative history of the Safe Harbor Provisions demonstrates that Congress intended to grant "special treatment" to swap agreements to prevent disruption to the capital markets. Thus, Swedbank continues, Congress must have intended to permit a creditor to satisfy its claims under a

---

**2.** Although we do not address the parties' textual arguments in this Memorandum and Order, we agree with Judge Peck that the text of section 553 supports appellees' position. Specifically, in 2005, Congress amended the clauses of section 553 that create exceptions to the general right of mutual setoff. *See* 11 U.S.C. § 553(a)(2)(B)(ii), (a)(3)(C). Though the 2005 amendments, Congress authorized

setoffs pursuant to sections 560 and 561 that otherwise would have been impermissible under section 553. We agree with appellees that the 2005 amendments support the conclusions that: (1) the Safe Harbor Provisions do not entirely preempt section 553; and (2) Congress knew how to exempt swap transactions from section 553 when it intended to do so.

pre-petition swap agreement by offsetting such claims against a debtor's post-petition deposits.

Appellees argue that the Safe Harbor Provisions create a more modest set of rights for non-bankrupt swap participants. According to appellees, the Safe Harbor Provisions entitle such a creditor to terminate the swap agreements, to determine which party is "in the money" under each swap agreement, and to net out all such agreements so that, once aggregated, only one party is "in the money." However, appellees contend that a swap counterparty is not authorized to exercise a right of setoff against a debtor's post-petition assets. We agree with appellees that the legislative history does not support Swedbank's broad construction of the Safe Harbor Provisions.

The legislative history of the Safe Harbor Provisions reveals three related themes, all of which focus narrowly on swap transactions and the swap market. First, the legislative history reflects that Congress intended to permit swap participants to terminate *swap agreements*. According to House Report 101–484:

> The new section 560 makes clear that a swap participant may exercise any contractual rights to terminate and net out a swap agreement in the event the other party files a bankruptcy petition, notwithstanding the automatic stay and trustee avoidance provisions of the Bankruptcy Code.... The intent of this provision is to permit either the non-debtor swap participant or the trustee to terminate a swap agreement, so that a swap agreement may continue after the bankruptcy petition is filed only by mutual consent of both the non-debtor swap participant and the trustee.

H.R.Rep. No. 101–484 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 228, *available at* 1990 WL 92539.[3] In other words, Congress intended that section 560 would enable parties to swap agreements to terminate *those* transactions; neither the statute nor the legislative history extends the application of section 560 to the general commercial obligations of parties to swap agreements.

Second, the legislative history reflects a concern for the stability of the often-volatile swap market. Consequently, Congress emphasized that the Safe Harbor Provisions permit immediate termination of swap transactions in order to minimize the non-bankrupt counterparty's exposure to such unpredictability. For example, House Report 101–484 introduces the legislation in the following terms:

> U.S. bankruptcy law has long accorded special treatment to transactions involving financial markets, to minimize volatility. Because financial markets can change significantly in a matter of days, or even hours, a non-bankrupt party to ongoing securities and other financial transactions could face heavy losses unless the transactions are resolved promptly and with finality.

H.R.Rep. No. 101–484, 1990 U.S.C.C.A.N. at p. 224. Likewise, Representative Hamilton Fish, Jr., who introduced the legislation in the House of Representatives, explained at the time of the House vote:

> [t]he stability of the swap market depends on the ability of a nondefaulting participant to terminate outstanding transactions quickly; rapid changes in currency values and interest rates can make delay very costly.

---

**3.** House Report No. 101–484, 1990 U.S.C.C.A.N. 223 is the principal legislative history for the safe harbor legislation. *See*

*generally* 5–560 Collier on Bankruptcy P 560.LH (2010).

136 Cong. Rec. 10421, 10422 (1990); *see also id.* at 10423 (statement of Rep. Charles Schumer) ("Instruments that are actively traded on the international capital markets fluctuate constantly in value. Counterparties to a bankrupt entity need immediate resolution of their claims in order to be able to hedge their positions in the increasingly volatile international capital markets."); 136 Cong. Rec. H2281, H2282 (1990) (statement of Rep. Jack Brooks) ("Congress has concluded that certain rapid, high-volume financial transactions warrant special bankruptcy treatment so as not to disrupt international capital markets.... unlike other types of contracts, these agreements are tied to a host of other past and future transactions in the marketplace ..."). Thus, Congress intended to prevent a swap counterparty from remaining tied up in existing positions and from being exposed to risk associated with short-term market movements.

Third, the legislative history addresses the need for swap participants to be able to close out existing transactions without fear that: (1) closing out swaps would violate the stay; (2) a debtor would opportunistically reject unfavorable swaps and assume favorable ones; or (3) the transactions would be challenged as voidable preferences. According to House Report 101–484:

> [u]nder the "avoidance" provisions in current bankruptcy law, if a swap agreement was in effect at the time one of the parties filed a bankruptcy petition, the

fund transfer from the debtor to the other party might be "avoidable" by the trustee, while the transfer from the other party to the debtor would not be. Concerns have been raised that under current bankruptcy law, termination and setoff of a swap agreement would be automatically stayed when one of the parties files a bankruptcy petition, whereupon the trustee, after indefinitely postponing termination of the swap agreement, could refuse setoff and unfairly "cherry pick" only the portions of the agreement advantageous to the debtor, while rejecting the portions unfavorable to the debtor.

H.R. Rep. No. 101–484, 1990 U.S.C.C.A.N. at p. 225; *see also* 136 Cong. Rec. 10421, 10423 (statement of Rep. Fish) ("[F]airness requires offsetting favorable transactions against unfavorable transactions and protecting payments made pursuant to swap agreements against the possible exercise of avoiding powers to set aside prebankruptcy transfers.")[4] Accordingly, Congress was further motivated by the fairness considerations that support the even-handed netting of favorable transactions against unfavorable ones to determine a single net termination value.

Moreover, as LBHI argues and Swedbank conceded at oral argument, there is not a single passage in the legislative history that specifically addresses whether the Safe Harbor Provisions were intended to be an exception to section 553. Like-

---

**4.** *See also Interest Swap: Hearing Before Subcommittee on Courts and Administrative Practice of the Senate Committee on the Judiciary,* 101st Cong. 9 (1989) (statement of Sen. Charles E. Grassley) ("The bill ensures that, upon a bankruptcy filing by one party, the other party can close out all existing swap transactions with the bankrupt party without having to keep the transaction open under the Code. The bill also ensures that all transactions between two parties can be netted out, as provided for in the swap agreement, to determine a single net termination value."); *id.* at 17 (testimony of then-Chairman of ISDA, Mark Brickell) (The safe harbors would "ensure that a bankruptcy filing by a party to a swap ... would not prevent a counterparty from exercising critical contractual rights. These include the counterparty's right to terminate the agreement, liquidate its position by determining a single net value, and foreclose on any collateral it holds.").

wise, there is no mention in the legislative history that the Safe Harbor Provisions were intended to eliminate the mutuality requirement. We think this silence is significant.

In sum, the legislative history plainly supports the argument that Swedbank was entitled to terminate the Master Agreements and to determine a single net termination value. However, it does not support Swedbank's position that the Safe Harbor Provisions permit setoff against LBHI's post-petition assets, which were fortuitously deposited in the Swedbank Account and which have no connection to the underlying swaps.[5]

Finally, if we were to accept Swedbank's argument, we would be obliged to conclude that a swap participant is entitled to a super-priority status that extends to all of its commercial transactions with the debtor. Congress neither wrote a statute that created this *de facto* super-priority status nor did Congress intend to do so. Moreover, had Congress intended to alter the bedrock principles of mutuality and priority, there would be some mention of this in the legislative history rather than the total silence that presently confronts us.[6]

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's decision is affirmed.

---

5. Indeed, even the legislative history cited by Swedbank in its briefs and at oral argument supports appellees' construction of the Safe Harbor Provisions and undermines Swedbank's own arguments.

6. Similarly, Swedbank argues that the Safe Harbor Provisions permit parties to contract out of the requirements of the Bankruptcy Code, including out of the mutuality requirement. We note that there is a paucity of support for this argument, which runs counter to the fundamental purposes of the bankruptcy law.